UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| SUN PRAIRIE, A PARTNERSHIP; AND BELL FARMS LLP, A NEBRASKA LIMITED LIABILITY PARTNERSHIP,<br><br>Plaintiffs,<br><br>and<br><br>COTTONWOOD KNOLL, LLC.,<br><br>Intervenor Plaintiff,<br><br>vs.<br><br>JAMES CASON, ACTING ASSISTANT SECRETARY – INDIAN AFFAIRS, U.S. DEPARTMENT OF THE INTERIOR, IN HIS OFFICIAL CAPACITY; GALE NORTON, SECRETARY OF THE DEPARTMENT OF THE INTERIOR, IN HER OFFICIAL CAPACITY; AND ROSEBUD SIOUX TRIBE, A FEDERALLY RECOGNIZED TRIBE,<br><br>Defendants.<br><br>and<br><br>CONCERNED ROSEBUD AREA CITIZENS, HUMANE FARMING ASSOCIATION, SOUTH DAKOTA PEACE AND JUSTICE CENTER, AND GEORGE ENGLAND,<br><br>Intervenor Defendants. | 3:02-CV-03030-RAL<br><br><br><br>OPINION AND ORDER ON PENDING MOTIONS |

On February 2, 2015, this Court held a motion hearing on three pending motions in this case. Those three pending motions are: (1) Cottonwood Knoll, LLC's Motion for Relief from Consent Judgment, Doc. 192; (2) Rosebud Sioux Tribe's Motion to Compel Specific Performance, Doc. 196; and (3) Cottonwood Knoll, LLC's Motion to Stay Pending Motions and to Require Mediation, Doc. 199. Some background facts aid in understanding how the current issues arose and in ruling on the pending motions.

I.  **Background Facts**

Plaintiff Sun Prairie, a general partnership (Sun Prairie) and the Rosebud Sioux Tribe (the Tribe) engaged in discussions about business opportunities to promote economic development on the Rosebud Sioux Indian Reservation in early 1998. Sun Prairie and the Tribe signed a letter of intent in April of 1998 and negotiated a Land Lease contemplating that Sun Prairie would secure financing to build multi-site hog confinement facilities on trust land in Mellette County, that Bell Farms, LLP (Bell Farms) would operate and manage the sites, and that the Tribe would provide water and other support. Sun Prairie secured financing for the project from U.S. Bancorp Ag Credit, Inc. (U.S. Bancorp). In September of 1998, the Tribe and Sun Prairie entered into a Land Lease, Doc. 177-4, which in turn was approved by the Aberdeen office of the Bureau of Indian Affairs. Sun Prairie then began construction of hog confinement facilities at the "Grassy Knoll" site and later at the "Cottonwood Farm" site.

The project met almost immediate public opposition, resulting in three separate lawsuits in two United States district courts—Concerned Rosebud Area Citizens v. Babbitt, No. 98-2841 (D.D.C. filed November 23, 1998, and dismissed July 12, 1999); Rosebud Sioux Tribe v. Gover, No. 99-3003-CBK (D.S.D. filed February 3, 1999, and dismissed May 30, 2003); and this action, Sun Prairie v. Rosebud Sioux Tribe, No. 02-3030-RAL (D.S.D. filed August 15, 2002). Sun

Prairie and Bell Farms filed this action after the Tribe, which had elected a new tribal president, became unsupportive of Sun Prairie's business ventures on the reservation. In April of 2005, the parties in this case settled many of their disputes by negotiating and agreeing to the terms of a Judgment by Consent and Order (Judgment by Consent), which was signed by the Honorable Richard H. Battey on May 19, 2005. Doc. 164. That Judgment by Consent modified but did not nullify the Land Lease. Doc. 164 at ¶ 5.a.(vii).

Sun Prairie, through its operator Bell Farms, operated hog confinement operations at the two sites—Grassy Knoll and Cottonwood Farm—until 2012. Bell Farms reportedly ceased operations in May of 2012, and there apparently have been no hogs at either site since.

On June 13, 2012, the Tribe filed in this case a Motion for an Order to Show Cause, seeking to enforce certain provisions of the Judgment by Consent. Cottonwood Knoll, LLC (Cottonwood Knoll) intervened on July 24, 2012, as a party asserting an interest relating to the property. Cottonwood Knoll had become the successor to the original mortgagor U.S. Bancorp and was foreclosing on Sun Prairie at that time.

This Court scheduled and conducted an evidentiary hearing on July 30, 2012, in which the Rosebud Sioux Tribe, intervenor Cottonwood Knoll, and the United States Government participated. This Court entered an Order for Enforcement of Judgment by Consent on July 31, 2012, applying Paragraph 11[1] of the Judgment by Consent to bind successors and assigns of the Plaintiffs to that Judgment, ordering Plaintiffs and any successors and assigns to comply with the provisions of Paragraph 7[2] of the Judgment by Consent, and allowing any party to file a motion to enlarge the deadline for compliance with Paragraph 7 or otherwise seek relief from this Court.

---

[1] Paragraph 11 of the Judgment by Consent provided: "This Consent Judgment is final and binding on the Parties and their successors and assigns." Doc. 164 at 13.
[2] Paragraph 7 of the Judgment by Consent contained provisions for environmental controls and measures. Doc. 164 at 9–10.

3

Doc. 187. Through an Amended Order for Enforcement of Judgment by Consent, this Court enlarged Cottonwood Knoll's deadline for compliance with Paragraph 7 of the Judgment by Consent or to otherwise seek relief to December 31, 2013. Doc. 189.

## II. Additional Facts and Pending Motions

On November 3, 2014, Cottonwood Knoll filed a Motion for Relief from Consent Judgment. Doc. 192. Cottonwood Knoll, after Sun Prairie and Bell Farms had ceased operations at Grassy Knoll and Cottonwood Farms, had initiated a foreclosure action in state court in Mellette County and had obtained a default judgment and decree of foreclosure against Sun Prairie in August of 2012, in the amount of $15,370,337.73. The Mellette County Circuit Court determined the fair and reasonable value of foreclosed property—the leasehold interest, structures, and equipment at Grassy Knoll and Cottonwood Farms—at that time to be $2,275,000.00. Doc. 194. Cottonwood Knoll was the winning bidder at a foreclosure sale on December 19, 2013, with a certificate of sale recorded in late December of 2013. Doc. 194. The one-year statutory redemption period on Sun Prairie's interest under South Dakota Codified Laws (SDCL) § 21-52-11 expired in December of 2014. As a result, Cottonwood Knoll now holds the leasehold interest in the Grassy Knoll and Cottonwood Farms.

Cottonwood Knoll in its motion sought to be relieved from the requirements of Paragraphs 4 and 7 of the Judgment by Consent in light of the "complete cessation of farming operations," by Sun Prairie and Bell Farms. Doc. 193 at 12. Cottonwood Knoll argued that the Land Lease has expired, that there are no environmental issues with the site, and that Rule 60 of the Federal Rules of Civil Procedure justifies either relieving Cottonwood Knoll of responsibility or deeming the Judgment by Consent to have been satisfied and released. Doc. 193.

Cottonwood Knoll in its motion raised an issue involving property tax payments. Notwithstanding that the sites are on tribal lands, Mellette County invoked SDCL § 10-4-2.1 to assess taxes on the buildings and improvements at Grassy Knoll and Cottonwood Farms, asserting that Sun Prairie owed delinquent property tax payments from 2006 through 2011, in the amount of $634,174.02. Doc. 194. Sun Prairie ultimately negotiated down that delinquency to $267,000.000 and signed a settlement agreement with Mellette County to pay that amount. Doc. 194-5. Mellette County continues to assess annual property taxes on the two sites. Doc. 194. Cottonwood Knoll invoked Section 49 of the Land Lease to seek renegotiation and adjustment of what is owed to the Tribe in order to receive credit for the payments to Mellette County.

The Tribe opposed Cottonwood Knoll's Motion for Relief from Consent Judgment and filed its own Motion to Compel Specific Performance. Docs. 196, 197. The Tribe argued that Plaintiffs and Cottonwood Knoll have abandoned the premises, thereby triggering a reclamation obligation under Exhibit I to the Land Lease to remove all improvements from Grassy Knoll and Cottonwood Farm and to remediate and return the sites to their original conditions. Alternatively, the Tribe argued that the Judgment by Consent runs the land lease to May 19, 2020, and that the Tribe is owed past-due rent of $405,000.000, plus interest, as well as water charges. The Tribe relied on Paragraph 9 of the Judgment by Consent to refuse any offset for property taxes paid by Sun Prairie or Cottonwood Knoll to Mellette County. Doc. 197.

Cottonwood Knoll opposed the Tribe's Motion for Specific Performance and filed a Motion to Stay Pending Motions and to Require Mediation. Docs. 199, 200, 202. Cottonwood Knoll invoked Paragraph 12.b. of the Judgment by Consent, under which the parties were to "negotiate in good faith to resolve any dispute relating to the interpretation and implementation of this Judgment by Consent before bringing the matter to the Court's attention." Doc. 164

¶ 12.b. Cottonwood Knoll asserted that it tried to negotiate with the Tribe, but that the Tribe identified no one with authority to negotiate on its behalf. The Tribe responded that it had a number of communications with Cottonwood Knoll and presently wants Cottonwood Knoll to pay past-due rent and remove all of the improvements from the Grassy Knoll and Cottonwood Farms locations now that, in the Tribe's view, the sites are abandoned. Cottonwood Knoll countered that the sites are not abandoned, that it has a maintenance employee on site, and that it has sought—albeit unsuccessfully—to find a new operator. According to Cottonwood Knoll, the improvements on the sites are worth over $2 million, and Cottonwood Knoll has offered them back to the Tribe free of charge to end the relationship altogether, but the Tribe has spurned that opportunity.

Neither side presented evidence at the hearing on February 2, 2015, but at this point there appears to be little dispute of material fact, other than over whether any good faith negotiations have occurred concerning the current disputes. Resolution of the present disputes turns primarily on interpretation of the Judgment by Consent and the underlying Land Lease, rather than on any disputed material fact. The parties have conflicting interpretations of certain provisions of the Land Lease and Judgment by Consent. Neither side has requested an evidentiary hearing. This Court accordingly can rule on many of the matters in dispute, although an evidentiary hearing may be necessary in the future if disputes between the parties fester.

### III. Discussion

#### A. Applicable Law

The agreement between these parties consists of the Land Lease, in which Cottonwood Knoll is the successor to the Permitted Mortgagee[3] and is now successor to Sun Prairie by foreclosure, as modified and superseded by the Judgment by Consent to which Cottonwood Knoll is bound both as a successor of Sun Prairie and by order of this Court. Docs. 164, 177-4, 187. Section 38 of the Land Lease specifies: "This Lease shall be construed for all purposes in accordance with and governed by the laws of the Tribe . . . ." Doc. 177-4 § 38. No parties to this case have pointed to any unique aspect of the law of the Rosebud Sioux Tribe concerning contract interpretation, and there appears to be nothing peculiar about the laws of the Rosebud Sioux Tribe concerning interpreting a contract. See Rosebud Sioux Commercial Code § 14-1-103 (supplementing the Tribe's commercial code with "the principles of law and equity").

The Judgment by Consent modifies and supersedes, but does not displace, the Land Lease. Doc. 164 ¶ 5.a.(vii). Such consent decrees have attributes of an ordinary contract and thus the same canons of contract construction generally apply. United States v. ITT Cont'l Baking Co., 420 U.S. 223, 236–37 (1975); Musso v. Univ. of Minn., 105 F.3d 409, 411 (8th Cir. 1997); Mahers v. Hedgepeth, 32 F.3d 1273, 1274–75 (8th Cir. 1994). However, because a consent decree represents a compromise between hostile litigants, the approach to interpreting a consent decree differs somewhat from the approach to interpreting a contract. Mahers, 32 F.3d at 1275. Recognizing that a consent decree is entered into by litigating parties and thus embodies a compromise between adversarial parties, the Supreme Court of the United States in United States v. Armour & Co., 402 U.S. 673 (1971) reasoned:

> Thus the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as

---

[3] Sections 18 and 19 of the Land Lease contain provisions regarding the Permitted Mortgagee, which originally was U.S. Bancorp and now is Cottonwood Knoll. Doc. 177-4 §§ 18–19.

7

> the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.

Id. at 681–82 (footnote omitted). Thus, this Court must confine its consideration of the Judgment by Consent to the "four corners" of that document and not seek to discern a single purpose of the parties.

The general rules for interpreting contracts include that contracts are to be enforced according to their terms, with the intent of the parties derived from reading the contract as a whole. E.g., Smith v. Arrington Oil & Gas, Inc., 664 F.3d 1208, 1212 (8th Cir. 2012) (applying Arkansas contract law); Myers v. Richland Cnty., 429 F.3d 740, 751 (8th Cir. 2005) (applying North Dakota contract law); Restatement (Second) of Contracts § 202(2) & cmt. d (1981). The language of the contract is to be given its ordinary and plain meaning. Neb. Pub. Power Dist. v. MidAmerican Energy Co., 234 F.3d 1032, 1040 (8th Cir. 2000) (applying Nebraska contract law); Restatement (Second) of Contracts § 202(3)(a) (1981). The terms of the contract are to be enforced when there is no ambiguity, and the mere fact that there is a dispute over application of a term does not render that term ambiguous. A contract is ambiguous when, by giving effect to the entirety of the contract and interpreting terms according to their common meanings, the provisions are reasonably capable of conflicting interpretations. Neb. Pub. Power Dist., 234 F.3d at 1041; see generally Sioux Falls Pizza Co. v. Little Caesar Enters., Inc., 858 F. Supp. 2d 1053, 1060–61 (D.S.D. 2012); Restatement (Second) of Contract §§ 200–03 (1981).

### B. Motion to Stay Pending Motions and to Require Mediation

The last of the three motions filed—Cottonwood Knoll's Motion to Stay Pending Motions and to Require Mediation, Doc. 199—deserves to be addressed first. Cottonwood Knoll based this motion on Paragraph 12.b. of the Judgment by Consent, which provides:

> The Parties to this Consent Judgment must negotiate in good faith to resolve any dispute relating to the interpretation and implementation of this Consent Judgment before bringing the matter to the Court's attention.

Doc. 164 ¶ 12.b. Cottonwood Knoll asserted that the Tribe did not negotiate in good faith and that this Court should mandate mediation, thereby deferring resolution of the pending motions. The Tribe resisted the motion and argued that it had negotiated, however briefly, in good faith.

Cottonwood Knoll's motion to require mediation cannot be granted for several reasons. First, neither Paragraph 12.b. of the Judgment by Consent nor any other provision contemplated court-ordered mediation. To the contrary, Section 30 of the Land Lease, in addressing such subjects as waiver of tribal sovereign immunity and jurisdiction, lists arbitration, and not mediation, as the alternative dispute resolution option. Doc. 177-4 § 30(f).

Second, judicial economy militates against granting the motion to stay. The inherent power of a court to control its docket, including the power to stay proceedings, requires balancing the "economy of time and effort for itself, for counsel, and for litigants." Landis v. N. Am. Co., 299 U.S. 248, 254–55 (1936). The parties are disputing whether there has been negotiation in good faith over the pending disputes. The parties' positions make clear that the chances for resolution of the pending contract disputes prior to a ruling from this Court are extremely remote. To defer consideration of these disputes and to direct these parties to negotiate further would be futile. Likewise, it would be a poor use of court resources and cause unnecessary cost and delay to conduct some evidentiary hearing on whether there has been negotiation in good faith and thereby postpone addressing the current contract interpretation disputes.

Third, there is an inconsistency to Cottonwood Knoll's argument here. Both Cottonwood Knoll in filing the initial motion for relief from the Judgment by Consent, Doc. 192, and the

Tribe in filing its motion to compel specific performance, Doc. 196, brought issues relating to the interpretation and implementation of the Judgment by Consent to this Court. Only after each side to this dispute filed those motions did Cottonwood Knoll invoke Paragraph 12.b. of the Judgment by Consent to assert that the motions are premature and should be addressed only after mediation. When Cottonwood Knoll filed its motion for judicial resolution of this issue, it necessarily implied that the precondition for judicial relief—good-faith negotiations—had already been met. In short, Paragraph 12.b. of the Judgment by Consent does not require mediation, a delay to allow further negotiation or compelled mediation between Cottonwood Knoll and the Tribe would be futile, and both parties initially recognized the need for a court ruling to break the impasse in positions by filing their motions putting at issue interpretation of certain contract terms.

### C. Lease Term and Termination

The motions of Cottonwood Knoll and the Tribe frame a dispute over the lease term and whether the lease has terminated or alternatively the sites have been abandoned. The Judgment by Consent in Paragraph 4 contains Term of Operation provisions, including the following:

> Except as provided herein, Sun Prairie and Bell Farms, or their respective successors and assigns, will operate the Farms for no more than fifteen (15) years from the date this Consent Judgment and Order becomes effective.

Doc. 164 ¶ 4.a. The Judgment by Consent became effective on May 19, 2005. Doc. 164. Paragraphs 4.b. and 4.c. of the Judgment by Consent provide that, at the expiration of the fifteen-year term, the Tribe would have the right to purchase the buildings and improvements at the sites by paying half of the fair market value, and that if the Tribe did not exercise its right to purchase, Sun Prairie or its successors could exercise "a one-time extension of the Lease term for an additional five (5) years." Doc. 164 ¶ 4. Paragraph 4 of the Judgment by Consent modified the

Term of Lease language in Section 8 of the Land Lease. Doc. 177-4 § 8. Neither Section 8 of the Land Lease nor Paragraph 4 of the Judgment by Consent provide for early termination by Sun Prairie or its successor Cottonwood Knoll. Indeed, the only provision of the Judgment by Consent or Land Lease that suggests a means for any early termination by Sun Prairie is Exhibit I to the Land Lease, which provides in part:

> In the event that the Lease is terminated by reason of abandonment of the Premises by Lessee, Lessee as an operating expense under this agreement, shall be solely responsible to reclaim and restore the premises . . . .

Doc. 177-4, Exhibit I. The reclamation plan contained in Exhibit I calls for a complete cleanup, including dismantling and removing structures from the site, removal of all poured concrete, and backfilling of all excavated areas after environmental cleanup. Id. None of those reclamation activities have been undertaken. Neither the Judgment by Consent nor the Land Lease contains a provision or any language to support Cottonwood Knoll's initial position that cessation of hog confinement operations or cessation of the business of Sun Prairie and Bell Farms or foreclosure on Sun Prairie effectuates the end of the lease term.

Cottonwood Knoll has not given notice of termination of the lease, nor is there any provision regarding termination by way of such notice. Cottonwood Knoll apparently has not written to the Tribe to advise that it has either terminated the lease or has an interpretation of lease terms under which the lease has expired. Rather, Cottonwood Knoll foreclosed to acquire lease rights among other things from Sun Prairie, sought out an operator for the sites unsuccessfully, and then sought to negotiate with the Tribe over termination of the lease, including offering to the Tribe the improvements on the sites worth over $2 million in exchange for being released from further responsibility. In short, neither the terms of the Judgment by

11

Consent and Land Lease nor the actions of Cottonwood Knoll support a conclusion that the lease term has expired.

The language of Paragraph 4.a. of the Judgment by Consent is curious in providing that "Sun Prairie and Bell Farms, or their respective successors and assigns, will operate the Farms for **no more than** fifteen (15) years from the date this Consent Judgment and Order becomes effective." Doc. 164 ¶ 4.a. (emphasis supplied). The subsequent sections of Paragraph 4 explain that the Tribe will have purchase rights for the buildings and improvements "[u]pon expiration of the fifteen-year term," Doc. 164 at ¶ 4.b., and specify circumstances under which operations of the farms may be extended for an additional five years, that is for an "extension not to exceed twenty (20) years from the date the Consent Judgment becomes effective," Doc. 164 ¶ 4.d. Reading the Judgment by Consent as a whole and focusing only on the four corners of the document, see Armour & Co., 402 U.S. at 681–82 ("[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it."), the only means of early termination of the lease term by the lessee is if the parties negotiated such a termination under Paragraph 12.b. of the Judgment by Consent or Sun Prairie abandoned the premises as provided in Exhibit I to the Land Lease. The most sensible way to read Paragraph 4 is to set a term of fifteen years of operation, with a one-time extension of the lease term available to allow for an additional five years of operation unless the Tribe bought the buildings and improvements at a price discount on fair market value. The "no more than" fifteen years language within Paragraph 4.a. can best be understood as an acknowledgment that the fifteen-year term is not absolute because the parties may negotiate an earlier termination, Sun Prairie or its successor may abandon the premises, or the Tribe could exercise the option

under Section 32[4] of the Land Lease under certain circumstances. As this dispute illustrates, the parties have not agreed to early termination of the lease term, so this Court must next decide whether Sun Prairie has abandoned the premises.

The Tribe asserted that there has been "abandonment of the Premises by Lessee" thereby triggering the reclamation plan under Exhibit I to the Land Lease. However, Cottonwood Knoll became the Permitted Mortgagee, is now the lessee under the Land Lease, and thereby has a right to cure any default of Sun Prairie thereunder. Doc. 177-4 § 19. This Court has permitted Cottonwood Knoll to intervene and entered an order, consistent with Paragraph 11 of the Judgment by Consent, binding Cottonwood Knoll to that Judgment by Consent. Doc. 187. Thus, although Sun Prairie and Bell Farms have abandoned the project, Cottonwood Knoll's activities may prevent abandonment of the premises.

The cessation of hog confinement activities at Grassy Knoll and Cottonwood Farms and the desire of Cottonwood Knoll to give the facilities to the Tribe to be relieved of its responsibility is not necessarily "abandonment of the Premises." Abandonment is the "absolute relinquishment of [a] premises by a tenant, and consists of acts or omissions and an intent to abandon." Smith v. Hegg, 214 N.W.2d 789, 792 (S.D. 1974) (quotation and emphasis omitted); see also Bank of Del. v. Claymont Fire Co. No. 1, 528 A.2d 1196, 1198 (Del. 1987);

---

[4]Section 32 of the Land Lease, which is not at issue presently between the parties, states:
> Termination. Upon the occurrence of an Event of Default by the Lessee and expiration of any applicable notice and cure period, the Tribe shall have the right to terminate this Lease with the consent of the Secretary, pursuant to 25 C.F.R. § 162.14 (as that regulation may be amended), subject to the rights of any transferee permitted hereunder or any Permitted Mortgagee, as provided in this Lease, and subject to the right of the Lessee during the 180 day period following the effective date of any such termination to remove all or any portion of the Personal Property.

Doc. 177-4 § 32.

Restatement (Second) of Property § 12.1 cmt. i (1977) ("An abandonment of the leased property by the tenant occurs when he vacates the leased property without justification and without any present intention of returning and he defaults in the payment of the rent."). Generally, the "mere absence of physical occupancy" does not constitute abandonment because, even though a lease provision may limit how a tenant may use a premises, such a provision is not a requirement that the tenant use the premises at all. Smith, 214 N.W.2d at 792; see also Bank of Del., 528 A.2d at 1198–99 (finding lessee fire company was not required to provide continuous service under the lease); Baron Bros., Inc. v. Nat'l Bank of S.D., Sioux Falls, 155 N.W.2d 300, 302–03 (S.D. 1968) (holding a provision in a lease that stated "[l]essee will use the demised premises for the purposes of its banking and trust business" did not require the bank to actually carry on such business activity for the duration of the lease). In this case, Section 15 of the Land Lease restricted Sun Prairie's use of the premises to constructing and operating the planned hog confinement operation, Doc. 177-4 § 15, but that restriction did not require the continuous operation of the hog confinement facilities for the duration of the lease. Moreover, Section 15 of the Land Lease allows a party who takes possession of the leasehold interest following foreclosure to use the premises "for any lawful purpose" other than gaming. Id. Neither Sun Prairie nor Cottonwood Knoll is obligated to continue the hog confinement operation for the duration of the lease, and the absence of the hog operation alone does not constitute abandonment. Cottonwood Knoll has an employee on its payroll monitoring the sites and has sought to find another operator for the sites. The Tribe in its filings acknowledged that at least one site was mowed and maintained. Doc. 197-3 at 12. Cottonwood Knoll would continue hog confinement activities at the sites if it could find an operator that could viably run such hog confinement and feedlot operations. There has been no physical act of abandonment nor does it

14

appear that Cottonwood Knoll has the intent at this time to abandon the premises. Thus, the lease has not been terminated by reason of abandonment, and the reclamation responsibilities of Exhibit I are not triggered at this time. Rather, under the language of the Judgment by Consent and the underlying Land Lease, the lease remains in effect at this time and through May 19, 2020.

### D. Financial Obligations

The next issue framed by the pending motions in this case is what amount Cottonwood Knoll owes to the Tribe and relatedly whether Cottonwood Knoll is entitled to offset certain property tax payments made to Mellette County. Paragraph 5 of the Judgment by Consent details the monetary payments that Sun Prairie or its successor Cottonwood Knoll owes to the Tribe. With the lease still running, Cottonwood Knoll owes rent and certain other payments. The Tribe asserted that the past-due rent was $405,000.00, plus interest, and there was no alternative calculation for past-due rent presented to this Court. Doc. 197 at 10.

Cottonwood asserted that, under Section 49 of the Land Lease, it is entitled to an adjustment for the property tax payments made to Mellette County for assessed taxes on buildings and improvements at Grassy Knoll and Cottonwood Farms. Mellette County initially assessed taxes and delinquencies of $634,174.02 for years 2006 through 2011, but Sun Prairie or Cottonwood Knoll negotiated down that amount and reached a settlement agreement with Mellette County to pay $267,000.00. Docs. 194, 194-5. Mellette County now assesses annual taxes on the sites of $15,522.20 and $11,451.14.[5] Docs. 205-1, 205-2. The Tribe countered that Paragraph 9 of the Judgment by Consent contained a release by which Sun Prairie agreed not to seek from the Tribe offset for tax payments to Mellette County.

---

[5] The annual taxes reflect the taxes owed from 2013. Docs. 205-1, -2. The annual assessments may fluctuate.

15

The Judgment by Consent, modifying and superseding certain provisions of the Land Lease, is the appropriate starting point for evaluating whether Mellette County property taxes affect the financial obligations between the parties. Paragraph 9 of the Judgment by Consent, in relevant part states:

> Sun Prairie also agrees to release all past and future claims for reimbursement by the Tribe of tax payments to Mellette County as provided for under Section 25 of the Lease.

Doc. 164 at ¶ 9. Cottonwood Knoll, however, based its entitlement to an adjustment on Section 49, and not on Section 25, of the Land Lease. The Judgment by Consent is silent as concerns Section 49 of the Land Lease.

Section 49 of the Land Lease provides:

> To the extent any South Dakota agencies or County should claim regulatory, licensing or taxing authority over the Premises, the parties agree to renegotiate and adjust the terms of this Lease as appropriate to adjust for such regulatory, licensing or taxing authority or claim.

Doc. 177-4 § 49. The Mellette County imposition of tax for the buildings and improvements on an annual basis qualifies as a "County . . . claim [of] taxing authority over the Premises," under Section 49 thereby triggering a responsibility "to renegotiate and adjust the terms of this Lease as appropriate to adjust for such . . . taxing authority or claim." Doc. 177-4 § 49.

Neither the language in Paragraph 9 of the Judgment by Consent nor any other provision nullifies or releases rights contained in Section 49 of the Land Lease. Paragraph 9 contains a release by Sun Prairie for claims for reimbursement by the Tribe of tax payments to Mellette County "as provided for under Section 25 of the Lease." Section 25 of the Land Lease is a broad provision with four subparts, some of which address taxation. Section 25 has as part of its design to avoid taxation of construction and operation of the hog confinement business by

placing tax payment responsibilities with the Tribe presumably so that the Tribe's sovereign immunity and independence from state regulation would shelter the project from state and local regulation and taxation. State or local taxation is directly addressed in Section 25(c), which provides:

> In the event that the State of South Dakota, or any subdivision, department or agency organized under the laws of the State of South Dakota, assesses any tax, fee or assessment against the Project or the construction thereof, such tax, fee or assessment, to the extent actually paid, shall be a Project Facilities Cost.

Doc. 177-4 ¶ 25(c). The definitions of "Project" and "Project Facilities Cost" in Paragraph 1 of the Land Lease suggest that this provision contemplates the contractors excise tax. Doc. 177-4 § 1(f), (g), Exhibit B. Section 25(a) has a broader scope, using the word "Premises," but is generic and does not specifically include the state or subdivision like Mellette County. Regardless, the last sentence of Paragraph 9 of the Judgment by Consent confines the release by Sun Prairie specifically to "tax payments to Mellette County as provided for under [Section] 25 of the Lease." Interpretation of a Judgment by Consent must focus on the "four corners," Armour & Co., 402 U.S. at 681–82, with the consent judgment construed as written and without attempting to find a purpose. Id. The absence of reference to Section 49 of the Land Lease and thus the absence of any release of a lessee's rights under Section 49 preserve to Cottonwood Knoll the position that the parties are "to renegotiate and adjust the terms of the Lease as appropriate to adjust for such . . . authority or claim." Doc. 177-4 § 49.

Ultimately, Cottonwood Knoll and the Tribe should be able to calculate how much Cottonwood Knoll owes the Tribe for rent, together with a negotiated adjustment for certain property taxes paid to Mellette County. That responsibility is ongoing, with the figures changing

periodically. This Court accordingly leaves it to the parties at this time to perform that calculation.

IV. **Conclusion and Order**

For the reasons explained above, it is hereby

ORDERED that Cottonwood Knoll's Motion for Relief from Consent Judgment, Doc. 192, is denied, except as set forth above. It is further

ORDERED that the Rosebud Sioux Tribe's Motion to Compel Specific Performance, Doc. 196, is granted in part and denied in part as set forth above. It is further

ORDERED that Cottonwood Knoll, LLC's Motion to Stay Pending Motions and to Require Mediation, Doc. 199, is denied. It is finally

ORDERED that the parties cooperate to calculate the amount that Cottonwood Knoll owes to the Rosebud Sioux Tribe based on the interpretation of the Judgment by Consent and underlying Land Lease set forth in this Opinion and Order on Pending Motions.

DATED this 7th day of April, 2015.

BY THE COURT:

_____
ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE