**FILED**

UNITED STATES DISTRICT COURT

JUL 0 1 2016

DISTRICT OF SOUTH DAKOTA

CLERK

CENTRAL DIVISION

| | |
|---|---|
| SUN PRAIRIE, A PARTNERSHIP; AND BELL FARMS LLP, A NEBRASKA LIMITED LIABILITY PARTNERSHIP, | 3:02-CV-03030-RAL |
| Plaintiffs, | |
| and | |
| COTTONWOOD KNOLL, LLC., | OPINION AND ORDER DETERMINING ADJUSTMENT TO AMOUNTS OWED |
| Intervenor Plaintiff, | |
| vs. | |
| JAMES CASON, ACTING ASSISTANT SECRETARY – INDIAN AFFAIRS, U.S. DEPARTMENT OF THE INTERIOR, IN HIS OFFICIAL CAPACITY; GALE NORTON, SECRETARY OF THE DEPARTMENT OF THE INTERIOR, IN HER OFFICIAL CAPACITY; AND ROSEBUD SIOUX TRIBE, A FEDERALLY RECOGNIZED TRIBE, | |
| Defendants. | |
| and | |
| CONCERNED ROSEBUD AREA CITIZENS, HUMANE FARMING ASSOCIATION, SOUTH DAKOTA PEACE AND JUSTICE CENTER, AND GEORGE ENGLAND, | |
| Intervenor Defendants. | |

1

This Court has held a number of hearings in this case and issued several opinions and orders. Back in April of 2015, after a hearing, this Court issued an Opinion and Order on Pending Motions (Opinion and Order), Doc. 206; Sun Prairie v. Cason, No. 3:02-CV-03030-RAL, 2015 WL 1548954 (D.S.D. Apr. 7, 2015), that interpreted provisions of the Land Lease and Judgment by Consent and Order (Judgment by Consent) governing relationships in this case. Because the language of the key provision of the Land Lease obliged the parties "to renegotiate and adjust the terms" under the circumstances presented, this Court ordered the parties to "cooperate to calculate the amount that Cottonwood Knoll owes to the Rosebud Sioux Tribe." Doc. 206 at 16, 18; Sun Prairie, 2015 WL 1548954, at *8–9. The parties were unable to "renegotiate and adjust the terms" as required under the Land Lease, despite efforts to do so. Accordingly, Cottonwood Knoll LLC (Cottonwood Knoll) filed a Motion for Court to Determine Offset, Doc. 207, and this Court conducted another hearing in this case on April 25, 2016. At that hearing, both of the interested parties in the present dispute—Cottonwood Knoll and the Rosebud Sioux Tribe (the Tribe)—agreed that, because of their failure to "renegotiate and adjust the terms," this Court should apply equitable principles to calculate the amounts owed under the Land Lease and Judgment by Consent between those parties. Repeating some of the facts and reasoning from this Court's Opinion and Order helps to explain why and how this Court calculates what Cottonwood Knoll owes to the Tribe.

## I.    Facts, Procedure and Prior Rulings

### A. Background Facts

Plaintiff Sun Prairie, a general partnership (Sun Prairie) and the Tribe engaged in discussions about business opportunities to promote economic development on the Rosebud Sioux Indian Reservation in early 1998. Sun Prairie and the Tribe signed a letter of intent in

2

April of 1998 and negotiated a Land Lease contemplating that Sun Prairie would secure financing to build multi-site hog confinement facilities on trust land in Mellette County, that Bell Farms, LLP (Bell Farms) would operate and manage the sites, and that the Tribe would provide water and other support. Sun Prairie secured financing for the project from U.S. Bancorp Ag Credit, Inc. (U.S. Bancorp). In September of 1998, the Tribe and Sun Prairie entered into a Land Lease, Doc. 177-4, which in turn was approved by the Aberdeen office of the Bureau of Indian Affairs. Sun Prairie then began construction of hog confinement facilities at the "Grassy Knoll" site and later at the "Cottonwood Farm" site.

The project met almost immediate public opposition, resulting in three separate lawsuits in two United States district courts—Concerned Rosebud Area Citizens v. Babbitt, No. 98-2841 (D.D.C. filed November 23, 1998, and dismissed July 12, 1999); Rosebud Sioux Tribe v. Gover, No. 99-3003-CBK (D.S.D. filed February 3, 1999, and dismissed May 30, 2003); and this action, Sun Prairie v. Rosebud Sioux Tribe, No. 02-3030-RAL (D.S.D. filed August 15, 2002). Sun Prairie and Bell Farms filed this action after the Tribe, which had elected a new tribal president, became unsupportive of Sun Prairie's business ventures on the reservation. In April of 2005, the parties in this case settled many of their disputes by negotiating and agreeing to the terms of a Judgment by Consent, which was signed by the Honorable Richard H. Battey on May 19, 2005. Doc. 164. That Judgment by Consent modified but did not nullify the Land Lease. Doc. 164 at 8, ¶ 5.a.(vii).

Sun Prairie, through its operator Bell Farms, operated hog confinement operations at the two sites—Grassy Knoll and Cottonwood Farm—until 2012. Bell Farms reportedly ceased operations in May of 2012, because the operations became economically nonviable, and there

3

apparently have been no hogs at either site since. Sun Prairie then could not pay its debts to its lender or the Tribe and now is defunct.

## B. Prior Motions and Rulings

On June 13, 2012, the Tribe filed in this case a Motion for an Order to Show Cause, Doc. 167, seeking to enforce certain provisions of the Judgment by Consent. Cottonwood Knoll intervened on July 24, 2012, as a party asserting an interest relating to the property. Doc. 180. Cottonwood Knoll had become the successor to the original mortgagor U.S. Bancorp and was foreclosing on Sun Prairie at that time.

This Court scheduled and conducted an evidentiary hearing on July 30, 2012, in which the Tribe, intervenor Cottonwood Knoll, and the United States government participated. Doc. 186. This Court entered an Order for Enforcement of Judgment by Consent on July 31, 2012, applying Paragraph $11^1$ of the Judgment by Consent to bind successors and assigns of the Plaintiffs to that Judgment, ordering Plaintiffs and any successors and assigns to comply with the provisions of Paragraph $7^2$ of the Judgment by Consent, and allowing any party to file a motion to enlarge the deadline for compliance with Paragraph 7 or otherwise seek relief from this Court. Doc. 187. Through an Amended Order for Enforcement of Judgment by Consent, this Court enlarged Cottonwood Knoll's deadline for compliance with Paragraph 7 of the Judgment by Consent or to otherwise seek relief to December 31, 2013. Doc. 189 at 2.

On November 3, 2014, Cottonwood Knoll filed a Motion for Relief from Consent Judgment. Doc. 192. Cottonwood Knoll, after Sun Prairie and Bell Farms had ceased operations at Grassy Knoll and Cottonwood Farms, had initiated a foreclosure action in state court in

---

[1] Paragraph 11 of the Judgment by Consent provided: "This Consent Judgment is final and binding on the Parties and their successors and assigns." Doc. 164 at 13.

[2] Paragraph 7 of the Judgment by Consent contained provisions for environmental controls and measures. Doc. 164 at 9–11.

Mellette County and had obtained a default judgment and decree of foreclosure against Sun Prairie in August of 2012, in the amount of $15,370,337.73. Doc. 193 at 9. The Mellette County Circuit Court determined the fair and reasonable value of foreclosed property—the leasehold interest, structures, and equipment at Grassy Knoll and Cottonwood Farms—at that time to be $2,275,000.00. Doc. 193 at 9; Doc. 194-2. Cottonwood Knoll was the winning bidder at a foreclosure sale on December 19, 2013, with a certificate of sale recorded in late December of 2013. Doc. 194-3. The one-year statutory redemption period on Sun Prairie's interest under South Dakota Codified Laws (SDCL) § 21-52-11 expired in December of 2014. As a result, Cottonwood Knoll now holds the leasehold interest in the Grassy Knoll and Cottonwood Farms. Sun Prairie reportedly is defunct.

Cottonwood Knoll in its 2014 motion sought to be relieved from the requirements of Paragraphs 4 and 7 of the Judgment by Consent in light of the "complete cessation of farming operations," by Sun Prairie and Bell Farms. Doc. 193 at 12. Cottonwood Knoll argued that the Land Lease had expired, that there were no environmental issues with the site, and that Rule 60 of the Federal Rules of Civil Procedure justified either relieving Cottonwood Knoll of responsibility or deeming the Judgment by Consent to have been satisfied and released. Doc. 193. The Tribe countered that Plaintiffs and Cottonwood Knoll have abandoned the premises, thereby triggering a reclamation obligation under Exhibit I to the Land Lease to remove all improvements from Grassy Knoll and Cottonwood Farm and to remediate and return the sites to their original conditions. Alternatively, the Tribe argued that the Judgment by Consent runs the Land Lease to May 19, 2020, and that the Tribe is owed past-due rent, water payments, and interest. For reasons explained in the Opinion and Order on Pending Motions, this Court determined that the lease term had not expired and that Cottonwood Knoll had not abandoned the

5

sites to trigger reclamation responsibilities. Doc. 206 at 10–15; Sun Prairie, 2015 WL 1548954, at *6–7. "Rather, under the language of the Judgment by Consent and the underlying Land Lease, the lease remains in effect at this time and through May 19, 2020." Doc. 206 at 15; Sun Prairie, 2015 WL 1548954, at *7.

Cottonwood Knoll in its 2014 motion also raised an issue regarding property tax payments. This issue arose from the fact that, notwithstanding the sites being on tribal lands, Mellette County invoked SDCL § 10-4-2.1 to assess taxes on the buildings and improvements at Grassy Knoll and Cottonwood Farms, asserting that Sun Prairie owed $634,175.02 for delinquent property tax payments from 2006 through 2011. Doc. 194-4. Sun Prairie, in conjunction with Cottonwood Knoll's vice president, ultimately negotiated down that delinquency to $267,000.00, and signed a settlement agreement with Mellette County to pay that amount. Doc. 193 at 10; Doc. 194-5. The vice president of Cottonwood Knoll, in February of 2013, paid $225,000 of that amount with Sun Prairie's tenant paying the remainder. Doc. 230. Mellette County continues to assess annual property taxes on the two sites. After intervening in this case, Cottonwood Knoll invoked Section 49 of the Land Lease to seek renegotiation and adjustment of what is owed to the Tribe in order to receive credit for the payments to Mellette County. The Tribe countered that Section 49 of the Land Lease did not apply and that Paragraph 9 of the Judgment by Consent relieved the Tribe of any obligation under Section 49 of the Land Lease.

This Court conducted a hearing on February 2, 2015, but neither side presented evidence and there was little dispute of material fact. Doc. 203. The prior Opinion and Order on Pending Motions released after that hearing reasoned that Section 49 of the Land Lease survived the Judgment by Consent and called for the parties "to renegotiate and adjust the terms of this Lease

6

as appropriate to adjust for" the taxes imposed by Mellette County. Doc. 206 at 16; Sun Prairie, 2015 WL 1548954, at *8. The opinion and order concluded that "Cottonwood Knoll and the Tribe should be able to calculate how much Cottonwood Knoll owes the Tribe for rent, together with a negotiated adjustment for certain property taxes paid to Mellette County." Doc. 206 at 17; Sun Prairie, 2015 WL 1548954, at *9. The parties were ordered to cooperate to calculate that amount.

## C. Present Dispute

Roughly one year later, on April 25, 2016, Cottonwood Knoll and the Tribe were back before this Court because they had failed to negotiate the adjustment or calculate the amount owed by Cottonwood Knoll to the Tribe. Doc. 225. Cottonwood Knoll had filed a Motion for Court to Determine Amount of Offset. Doc. 207. At the hearing on that motion, neither party submitted any additional evidence. Cottonwood Knoll and the Tribe agreed during argument that, although Section 49 of the Land Lease requires the parties "to renegotiate and adjust the terms . . . to adjust for . . . taxing authority or claim[s]," Doc. at 177-4 at 27, an impasse exists such that this Court at this time should resort to equitable principles to calculate the proper adjustment under the circumstances. This Court then discussed how it preliminarily viewed equitable principles to apply, including apparent waiver by the predecessor in interest to Cottonwood Knoll of application of Section 49 to any claim for adjustment predating Cottonwood Knoll's involvement in the negotiated Settlement Agreement with Mellette County. Doc. 209-2.

The information submitted by both interested parties as of April of 2016 seemed to be stale and lacked information on real estate taxes paid in 2015, the unpaid rent in 2015, and unpaid utility bills owed by Cottonwood Knoll to the Tribe. Also, the parties were unsure

7

whether the Tribe, whose law is to govern under Section 38 of the Land Lease, Doc. 177-4 at 24, has an applicable prejudgment interest rate, and, if not, what interest rate ought to be used in the calculations. This Court, as discussed at the hearing, entered an Order Requiring Additional Submissions on Pending Motions. Doc. 226. Cottonwood Knoll and the Tribe each submitted additional information consistent with that order. Docs. 229, 230, 231, 232.

The parties do not have a dispute of fact here; the amounts owed under the Judgment by Consent and amounts paid for taxes to Mellette County are established and uncontested. However, the parties at this time primarily contest how far back in time this Court should go in determining the adjustment for Mellette County property taxes and what prejudgment interest rate ought to apply. Both parties desire to have this Court decide those issues because the parties have stalemated in negotiating those matters.

## II.   Discussion

### A.   Applicable Law

The agreement between these parties consists of the Land Lease, in which Cottonwood Knoll is the successor to the Permitted Mortgagee[3] and is now successor to Sun Prairie by foreclosure, as modified and superseded by the Judgment by Consent to which Cottonwood Knoll is bound both as a successor of Sun Prairie and by order of this Court. Docs. 164, 177-4, 187, 189. Section 38 of the Land Lease specifies: "This Lease shall be construed for all purposes in accordance with and governed by the laws of the Tribe . . . ." Doc. 177-4 at 24. No parties to this case have pointed to any unique aspect of the law of the Tribe concerning contract interpretation, and there appears to be nothing peculiar about the laws of the Tribe concerning

---

[3] Paragraphs 18 and 19 of the Land Lease contain provisions regarding the Permitted Mortgagee, which originally was U.S. Bancorp and now is Cottonwood Knoll. Doc. 177-4 at 13–15.

8

interpreting a contract.    See Rosebud Sioux Tribe Law and Order Code § 14-1-103
(supplementing the Tribe's commercial code with "the principles of law and equity").

The Judgment by Consent modifies and supersedes, but does not displace, the Land
Lease. Doc. 164 at 8, ¶ 5.a.(vii). Such consent decrees have attributes of an ordinary contract
and thus the same canons of contract construction generally apply. United States v. ITT Cont'l
Baking Co., 420 U.S. 223, 236–37 (1975); Musso v. Univ. of Minn., 105 F.3d 409, 411 (8th Cir.
1997); Mahers v. Hedgepeth, 32 F.3d 1273, 1274–75 (8th Cir. 1994). However, because a
consent decree represents "a compromise between hostile litigants," the approach to interpreting
a consent decree differs somewhat from the approach to interpreting a contract. Mahers, 32 F.3d
at 1275. Recognizing that a consent decree is entered into by litigating parties and thus
embodies a compromise between adversarial parties, the Supreme Court of the United States in
United States v. Armour & Co., 402 U.S. 673 (1971) reasoned:

> Thus the *decree* itself cannot be said to have a purpose; rather the *parties* have
> purposes, generally opposed to each other, and the resultant decree embodies as
> much of those opposing purposes as the respective parties have the bargaining
> power and skill to achieve. For these reasons, the scope of a consent decree must
> be discerned within its four corners, and not by reference to what might satisfy the
> purposes of one of the parties to it.

Id. at 681–82 (footnote omitted). Thus, this Court must confine its consideration of the
Judgment by Consent to the "four corners" of that document and not seek to discern a single
purpose of the parties.

The general rules for interpreting contracts include that contracts are to be enforced
according to their terms, with the intent of the parties derived from reading the contract as a
whole. E.g., Smith v. Arrington Oil & Gas, Inc., 664 F.3d 1208, 1212 (8th Cir. 2012) (applying
Arkansas contract law); Myers v. Richland Cty., 429 F.3d 740, 751 (8th Cir. 2005) (applying
North Dakota law); Restatement (Second) of Contracts § 202(2) & cmt. d (1981). The language

9

of the contract is to be given its ordinary and plain meaning. Neb. Pub. Power Dist. v. MidAmerican Energy Co., 234 F.3d 1032, 1040 (8th Cir. 2000) (applying Nebraska law); Restatement (Second) of Contracts § 202(3)(a). The terms of the contract are to be enforced when there is no ambiguity, and the mere fact that there is a dispute over application of a term does not render that term ambiguous. Neb. Pub. Power Dist., 234 F.3d at 1040–41. A contract is ambiguous when, by giving effect to the entirety of the contract and interpreting terms according to their common meanings, the provisions are reasonably capable of conflicting interpretations. Id. at 1041; see also Sioux Falls Pizza Co. v. Little Caesar Enters., 858 F. Supp. 2d 1053, 1060–61 (D.S.D. 2012); Restatement (Second) of Contract §§ 200–03.

Equitable principles generally do not apply in an action involving a valid contract because a contract action is legal and not equitable in nature. However, both parties to this dispute agree that equitable principles should apply to determining the Section 49 adjustment that should have been, but could not be, negotiated. "There are matters that arise under contracts, however, that are cognizable in equity, such as when mutual mistake, inequitable conduct, misrepresentation, impossibility, fraud or collusion arise, or where there is no adequate remedy at law under the contract's terms." 27A Am. Jur. 2d Equity § 45 (West 2016) (footnotes omitted). For instance, equitable principles can be applied to contract disputes when the contract does not address the dispute that arises. Id.; Jackson v. Allstate Ins., 785 F.3d 1193, 1201 (8th Cir. 2015) (noting exception to equitable considerations in contract actions applies to "further the ends of justice . . . when an enforceable written contract does not fully address a subject" (internal quotation marks and quotation omitted) (applying Arkansas law)); Watkins Inc. v. Chilkoot Distrib., Inc., 719 F.3d 987, 995 (8th Cir. 2013) (stating that when an express contract does not fully address the contract dispute, such as the details of compensation, equitable

10

recovery is permitted (applying Minnesota law)); Pinnacle Pizza Co. v. Little Caesar Enters., Inc., 395 F. Supp. 2d 891, 903 (D.S.D. 2005) (stating that an unjust enrichment claim may proceed in a contract action if the written contract between the parties does not completely address the dispute at issue (applying Michigan law)); Drysdale v. Woerth, 153 F. Supp. 2d 678, 688 (E.D. Pa. 2001), aff'd, 53 F. App'x 226 (3d Cir. 2002) (holding that although written lease existed between tenant and landlord, tenant was entitled to compensation for improvement made to leasehold under theory of unjust enrichment because remedy tenant sought was outside of the scope of the written lease). "The goal of equitable relief is not to punish the wrongdoer; it is to restore the plaintiff to the enjoyment of the right which has been interfered with to the fullest extent possible or to prevent violation of a right before the threatened injury is done or further violation after the injury has been partially effected." Graves v. Romney, 502 F.2d 1062, 1064–65 (8th Cir. 1974). If equitable principles are found to be appropriate, a court is afforded "considerable latitude and discretion in applying and formulating an equitable remedy in a breach-of-contract action." 27A Am. Jur. 2d Equity § 45.

## B. Section 49 Adjustment to Rent

Paragraph 5 of the Judgment by Consent details the monetary payments that Sun Prairie or its successor Cottonwood Knoll owes to the Tribe. Paragraph 5(i) of the Judgment by Consent provides:

> Sun Prairie will make a total fixed payment of $60,000 per calendar year per Farm commencing *pro rata* in calendar year 2005. Sun Prairie will make semi-annual installment payments on April 1 and October 1, to the BIA for distribution to the Tribe.

Doc. 164 at 7, ¶ 5(i). Paragraph 5(ii) of the Judgment by Consent adds:

> Sun Prairie will pay $15,000 per year for water used from the well Sun Prairie operates at the Cottonwood Farm commencing *pro rata* in calendar year 2005,

11

> payable in semi-annual installments due April 1 and October 1 to the BIA for
> distribution to the Tribe.

Doc. 164 at 7, ¶ 5(ii). The Tribe received no payment of these amounts after the April 1, 2011

payment. Doc. 231-2. The ten missed payments from October 1, 2011, through April 1, 2016,

total $675,000. Doc. 231 at 3.

This Court previously ruled that Cottonwood Knoll is entitled to an adjustment under

Section 49 of the Land Lease for the property tax payments made to Mellette County for

assessed taxes on buildings and improvements at Grassy Knoll and Cottonwood Farms. Mellette

County assessed taxes with interest and penalties of $634,175.02 for years 2006 through 2011,[4]

but Sun Prairie or Cottonwood Knoll negotiated down that amount and reached a settlement

agreement with Mellette County to pay $267,000.00. Docs. 194, 194-5, 230. Mellette County

assessed annual taxes on the sites during 2013 of $15,522.20 and $11,451.14.[5] Docs. 205-1,

205-2, 230. The Tribe had countered that Paragraph 9 of the Judgment by Consent contained a

release by which Sun Prairie agreed not to seek from the Tribe offset for tax payments to

Mellette County. This Court believes it appropriate to repeat its reasoning on why the

adjustment language of Section 49 survives the modifications in the Judgment by Consent.

The Judgment by Consent, modifying and superseding certain provisions of the Land

Lease, is the appropriate starting point for evaluating whether Mellette County property taxes

affect the financial obligations between the parties. Paragraph 9 of the Judgment by Consent, in

relevant part states:

---

[4] Real estate taxes apparently were paid for 2010.

[5] Cottonwood Knoll has provided a much higher figure for 2014, but the added amount may be
attributable at least in part to penalty and interest. This Court is not using the 2014 figures in its
calculations because Cottonwood Knoll had not yet paid 2014 property taxes to Mellette County
when these issues were finally submitted for decision.

> Sun Prairie also agrees to release all past and future claims for reimbursement by
> the Tribe of tax payments to Mellette County as provided for under Section 25 of
> the Lease.

Doc. 164 at 12, ¶ 9. Cottonwood Knoll, however, based its entitlement to an adjustment on

Section 49, and not on Section 25, of the Land Lease. The Judgment by Consent is silent as

concerns Section 49 of the Land Lease.

Section 49 of the Land Lease provides:

> To the extent any South Dakota agencies or County should claim regulatory,
> licensing or taxing authority over the Premises, the parties agree to renegotiate
> and adjust the terms of this Lease as appropriate to adjust for such regulatory,
> licensing or taxing authority or claim.

Doc. 177-4 at 27. The Mellette County imposition of tax for the buildings and improvements on

an annual basis qualifies as a "County . . . claim [of] . . . taxing authority over the Premises,"

under Section 49 thereby triggering a responsibility "to renegotiate and adjust the terms of this

Lease as appropriate to adjust for such . . . taxing authority or claim." Doc. 177-4 at 27.

Neither the language in Paragraph 9 of the Judgment by Consent nor any other provision

nullifies or releases rights contained in Section 49 of the Land Lease. Paragraph 9 contains a

release by Sun Prairie for claims for reimbursement by the Tribe of tax payments to Mellette

County "as provided for under Section 25 of the Lease." Doc. 164 at 12, ¶ 9. Section 25 of the

Land Lease is a broad provision with four subparts, some of which address taxation. Section 25,

as part of its design, avoids taxation of construction and operation of the hog confinement

business by placing tax payment responsibilities with the Tribe presumably so that the Tribe's

sovereign immunity and independence from state regulation would shelter the project from state

and local regulation and taxation. State or local taxation is directly addressed in Section 25(c),

which provides:

13

> In the event that the State of South Dakota, or any subdivision, department or agency organized under the laws of the State of South Dakota, assesses any tax, fee or assessment against the Project, or the construction thereof, such tax, fee or assessment, to the extent actually paid, shall be a Project Facilities Cost.

Doc. 177-4 at 18, ¶ 25(c). The definitions of "Project" and "Project Facilities Cost" in Section 1 of the Land Lease suggest that this provision contemplates the contractors excise tax. Doc. 177-4 at 2, Exhibit B. Section 25(a) has a broader scope, using the word "Premises," but is generic and does not specifically include the state or any subdivision like Mellette County. Regardless, the last sentence of Paragraph 9 of the Judgment by Consent confines the release by Sun Prairie specifically to "tax payments to Mellette County as provided for under Section 25 of the Lease." Doc. 164 at 12, ¶ 9. Interpretation of a Judgment by Consent must focus on the "four corners" with the consent judgment construed as written and without attempting to find a purpose. Armour & Co., 402 U.S. at 681–82. The absence of reference to Section 49 of the Land Lease and thus the absence of any release of a lessee's rights under Section 49 preserve to Cottonwood Knoll the position that the parties are "to renegotiate and adjust the terms of this Lease as appropriate to adjust for such . . . taxing authority or claim." Doc. 177-4 at 27.

Cottonwood Knoll first invoked Section 49 of the Land Lease after intervening in this action in July of 2012. Docs. 175, 180. Sun Prairie, the predecessor in interest to Cottonwood Knoll, never invoked Section 49 even during the time the parties were negotiating financial arrangements between them culminating in the Judgment by Consent in May of 2005. After May of 2005, Sun Prairie's tenant paid the 2005 property taxes due, part of the 2006 property taxes due, and the 2010 property taxes. Doc. 230 at 2. Sun Prairie itself paid the 2007 and later the 2009 taxes due to Mellette County. Doc. 230 at 2. Sun Prairie continued as the owner of improvements and as lessee until foreclosure by Cottonwood Knoll in August of 2012. Despite Sun Prairie's many years of silence on the issue, Cottonwood Knoll now seeks an adjustment

14

under Section 49 of the Land Lease for all tax payments to Mellette County made by Sun Prairie or Sun Prairie's tenant.

Both Cottonwood Knoll and the Tribe agree that this Court should resort to equitable principles in deciding the proper adjustment under Section 49 of the Land Lease. The equitable principle of waiver applies when there is "an intentional relinquishment of a known right." Smith v. Chase Grp., Inc., 354 F.3d 801, 807 (8th Cir. 2004) (applying Kansas law); United Forest Products Co. v. Baxter, 452 F.2d 11, 14 & n.1 (8th Cir. 1971) (applying Iowa law). "[W]aiver occurs when '[o]ne in possession of any right, whether conferred by law or by contract, and with full knowledge of the material facts, does or forebears the doing of something inconsistent with the exercise of the right.'" Kroeplin Farms Gen. P'ship v. Heartland Crop Ins., 430 F.3d 906, 910 (8th Cir. 2005) (second alteration in original) (quoting Flugge v. Flugge, 2004 SD 76, ¶ 18, 681 N.W.2d 837, 842).

Sun Prairie waived its right to seek an adjustment under Section 49 of the Land Lease for payments to Mellette County predating 2013. Sun Prairie was a party to the Land Lease and thus had knowledge of the terms and its rights thereunder. Sun Prairie also had knowledge of the Mellette County property tax obligation at least as early as November of 2005 when it had its tenant pay Mellette County for the assessment on the hog confinement facilities of Sun Prairie. Sun Prairie did not invoke Section 49 of the Land Lease to seek an adjustment at any time from 2005 through the point when Sun Prairie was foreclosed upon in August of 2012 and became defunct. The first such invocation of that contract provision came from Cottonwood Knoll after its intervention in this case in 2012.

Cottonwood Knoll asserts that any waiver by Sun Prairie had to be in writing to be effective. Doc. 229 at 4. To make this argument, Cottonwood Knoll relies on Section 41 of the Land Lease, which states in part:

> The Tribe and/or the Lessee may grant a waiver of any term of this Lease, but such must be in writing and signed by the Tribe or Lessee, as the case may be, before becoming effective.

Doc. 177-4 at 25. If Cottonwood Knoll's argument against waiver were accepted, under Cottonwood Knoll's calculation, it owes nothing to the Tribe, notwithstanding that the last ten rent and utility payments spanning five years' time have gone unpaid. This quixotic outcome conflicts with the terms of the Judgment of Consent, which ensured a return to the Tribe through a lease and water payment made twice annually. While Section 49 of the Land Lease allows a negotiated adjustment, it does not contemplate obliteration of the annual rent and water payments. Even if Section 41 of the Land Lease were read to prevent waiver, the conduct of Sun Prairie, its many years of silence on the Section 49 adjustment, and the circumstances of this case justify application of the equitable principle of laches to bar assertion of an adjustment for property taxes paid prior to 2013. See Harleysville Worchester Ins. Co. v. Diamondhead Prop. Owners Ass'n, Inc., 741 F.3d 1336, 1338 (8th Cir. 2014) ("[L]aches is based on the equitable principle that an unreasonable delay by the party seeking relief precludes recovery when the circumstances are such as to make it inequitable or unjust for the party to seek relief." (internal quotation marks and quotation omitted) (applying Arkansas law)); Hot Stuff Foods, LLC v. Mean Gene's Enters., 468 F. Supp. 2d 1078, 1093 (D.S.D. 2006) (stating that in determining whether the doctrine of laches should bar a lawsuit, a court should evaluate "all the particular circumstances of [the] case . . . including the length of delay, the reasons for it, its effect on the [parties], and the overall fairness of permitting [the moving party] to assert [its] action." (quoting

Citizens & Landowners Against the Miles City/New Underwood Powerline v. Secretary, U.S. Dep't of Energy, 683 F.2d 1171, 1174 (8th Cir. 1982))).

The Tribe opposes any adjustment under Section 49 of the Land Lease, but alternatively asserts that any adjustment allowed be confined to only the two tax payments made by Cottonwood Knoll in November of 2014. Doc. 232. The Tribe in its calculation uses a dollar-for-dollar adjustment; that is, discounting from what Cottonwood Knoll owes the Tribe the full amount of the property tax paid to Mellette County. This Court agrees that such a dollar-for-dollar adjustment makes sense under the law, equity, agreements, and circumstances. The parties contemplated at the time of the Land Lease and Judgment by Consent both that the hog confinement operations would be financially viable for the years ahead and that the trust land on which the confinement facilities sat would insulate the facilities from state or local taxing authority. Sun Prairie under the Land Lease as modified by the Judgment by Consent bears the entire risk—now the reality—of the hog confinement operations being economically nonviable. The Tribe remains entitled to receive rent and certain utility payments regardless. It makes sense equitably to allow a dollar-for-dollar adjustment for the Mellette County property tax payments, thereby placing on the Tribe the risk—now the reality—of the trust-land status not insulating the sites from taxation.

The question then becomes from what point Cottonwood Knoll is entitled to seek such an adjustment. As stated above, Sun Prairie's conduct constituted a waiver or a bar under the doctrine of laches for it to seek an adjustment under Section 49 of the Land Lease. Cottonwood Knoll, however, cannot be charged with having voluntarily relinquished a known right and the doctrine of laches does not apply to bar adjustment for tax payments during Cottonwood Knoll's involvement. Stephen Stenehjem, the vice president of Cottonwood Knoll, paid $225,000 for the

17

benefit of Cottonwood Knoll and Sun Prairie on February 13, 2013, and directed $42,000 from Sun Prairie's tenant as a part of a settlement with Mellette County for past-due property taxes for the years 2007 to 2013 (except year 2010 which had been paid). Doc. 230 at 2. The settlement agreement represented a steep discount in the amount of taxes and interest sought by Mellette County. Cottonwood Knoll was assessed and paid $15,522.20 and $11,451.14 to Mellette County for the 2014 property taxes. Doc. 230 at 2. Thus, the total paid directly by or on behalf of Cottonwood Knoll to date for Mellette County property taxes is $293,973.34. Cottonwood Knoll is entitled to a dollar-for-dollar adjustment for that amount. Cottonwood Knoll likewise is entitled to an annual adjustment for the property taxes owed annually to Mellette County against the $135,000 total annual rent and water payment.

## C. Prejudgment Interest Rate

The next issue on which the parties disagree is what the prejudgment interest rate should be. The Tribe seeks to apply a 15% prejudgment interest rate based on a tribal code provision setting a 15% postjudgment interest rate, while Cottonwood Knoll advocates for the federal prejudgment interest rate under 28 U.S.C. § 1961, which as of April of 2016 was .56% per annum.

The Land Lease specifies that tribal law governs, so this Court first looks to the Rosebud Sioux Tribe Law and Order Code. Section 8-7-2 of that code provides: "The detriment caused by the breach of an obligation to pay money only is deemed to be the amount due by the terms of the obligation with interest thereon." Thus, the Tribe is entitled to prejudgment interest on the unpaid rent and water cost, subject to the adjustment for Mellette County taxes paid. The Tribe's Land and Order Code, however, lacks a provision establishing a prejudgment interest rate. Section 8-6-5 established a postjudgment interest rate by stating: "Interest on damages shall be

18

15% from the date of judgment until paid." Prejudgment interest and postjudgment interest are not the same thing. Cf. Travelers Prop. Cas. Ins. Co. of Am. v. Nat'l Union Ins. Co., 735 F.3d 993, 1004–09 (8th Cir. 2013) (analyzing prejudgment and postjudgment interest separately and applying different rates for each to monetary award); Happy Chef Sys., Inc. v. John Hancock Mut. Life Ins., 933 F.2d 1433, 1435–38 (8th Cir. 1991) (same).

The Tribe's Law and Order Code contains a gap filling provision in § 4-2-8 as follows:

The Tribal court shall apply the applicable laws of the Rosebud Sioux Tribe and the United States in actions before it. Any matter not covered by applicable tribal or federal laws shall be decided according to the customs and usage of the Tribe. Where doubt arises as to customs and usages of the Tribe, the Court may request the advice of persons generally recognized in the community as being familiar with such customs and usages. In any matter in which the rule of law is not supplied by any of the above, the Tribal Court may look to the law of any tribe or state which is consistent with the policies underlying tribal law, custom and usages.

This Court has searched for decisions of the Rosebud Sioux Tribal Court applying a prejudgment interest rate, but has found none. Neither party cited to or referenced any tribal court decision. Neither party provided any information or argument about tribal customs and usage.

Section 4-2-8 of the Tribe's Code references application of the laws of the United States in tribal court matters. Under 28 U.S.C. § 1961(a), the prejudgment interest rate in federal court is the "1-year constant maturity Treasury yield . . . for the calendar week preceding the date of the judgment," which was .56% in April of 2016. It is hard to accept that tribal law would establish a 15% postjudgment interest rate and yet incorporate by reference from federal law a prejudgment interest rate below 1%. These two disparate rates more properly reflect guideposts in this Court's evaluation of the proper prejudgment interest rate.

This Court next looks to federal case law in determining how to select a prejudgment interest rate under these peculiar circumstances. The decision of the United States Court of

19

Appeals for the Eighth Circuit most directly on point is Turn Key Gaming, Inc. v. Oglala Sioux Tribe, 313 F.3d 1087, 1093 (8th Cir. 2002). The Eighth Circuit stated in Turn Key Gaming that "[g]enerally, the award of prejudgment interest, in the absence of statutory directives, rests in the discretion of the district court. . . . Prejudgment interest is to be awarded whenever damages lawfully due are withheld, unless there are exceptional circumstances to justify the refusal." Id. at 1093 (quoting Cargill, Inc. v. Taylor Towing Serv., Inc., 642 F.2d 239, 241 (8th Cir. 1981)). In Turn Key Gaming, the Eighth Circuit determined that the district court's decision to apply South Dakota's prejudgment interest rate under SDCL § 21-1-13.1 (the 10% rate per year as cross-referenced in SDCL § 54-3-16) was not an abuse of discretion and therefore affirmed use of the 10% state rate. 313 F.3d at 1092–93. The Turn Key Gaming decision is silent as to whether tribal law governed the contract—between a casino operator and a tribe— at issue, and at any rate would have involved the law of the Oglala Sioux Tribe and not the Rosebud Sioux Tribe. The Tribal Code of the Rosebud Sioux Tribe in § 4-2-8 subordinates application of state law in tribal court behind tribal law, United States law, and customs and usage of the tribe. State law under § 4-2-8 is placed alongside "the law of any tribe" as a final resort for law to apply. Thus, although the Rosebud Sioux Tribe is located geographically within South Dakota, South Dakota's 10% prejudgment interest rate is no more than another guidepost.

Turn Key Gaming places the prejudgment interest rate in the discretion of this Court when, as here, there is an "absence of statutory directives." 313 F.3d at 1093 (quotation omitted). Thus, it makes sense for this Court to consider the purpose of prejudgment interest in seeking out other guideposts. Prejudgment interest has two main underlying purposes. First, prejudgment interest seeks to avoid rewarding the party who owes money and to avoid incenting such a party to delay and withhold payment due until judgment. In re Pago Pago Aircrash of Jan.

30, 1974, 525 F. Supp. 1007, 1014 (C.D. Cal. 1981) (noting that without prejudgment interest, a "tortfeasor benefits from denying liability and continuing to litigate, while he retains the use of money to which the plaintiff is entitled, and the plaintiff is deprived of the benefit he should have derived from an immediate recovery); Martin Oyos, Prejudgment Interest in South Dakota, 33 S.D. L. Rev. 484, 484 (1988) (recognizing that one of purposes of prejudgment interest is "to deprive the defendant of any benefit gained by use of money to which the plaintiff was entitled"). Thus, a reasonable prejudgment interest rate should be above the rate of inflation and perhaps above the rate a bank would charge on a loan. After all, if the prejudgment interest rate is below the interest rate on business loans or as low as the rate of inflation, a savvy business might choose not to pay some debts, to get sued, and to protract litigation (as long as attorney's fees and litigation costs can be controlled) as a less expensive source of money than bank loans. Thus, other guideposts ought to be the inflation rate in the United States over the time at issue, which was approximately 3.5% in the month of October of 2011 at the time of the first missed payment and currently is approximately 1%. Historical Inflation Rates: 1914–2016, U.S. Inflation Calculator, https://www.usinflationcalendar.com/inflation/historical-inflation-rates (last visited June 28, 2016). The average inflation rate has been about 1.8% per annum over the time the debt has been owed, so the prejudgment interest rate theoretically ought to exceed that percentage. See id. Yet another guidepost is the interest rates typically charged on commercial loans, which is a much more difficult figure to quantify. Sun Prairie and Cottonwood Knoll are commercial businesses, and Sun Prairie at least in retrospect was a high risk business to which to loan. Commercial and industrial loans made by small domestic banks, which is a typical lender to hog confinement businesses in South Dakota, for more than 365 days to moderate risk businesses presently appears to be 5.48% per annum. Survey of Terms of Business Lending –

21

E.2., Bd. of Governors of the Fed. Reserve Sys., https:www.federalreserve.gov/releases/e2/current (last visited June 28, 2016). These percentages again are guideposts.

The second and predominant purpose of prejudgment interest is to give the party from whom monies are wrongly withheld a reasonable rate of return to allow true compensation to that party. City of Milwaukee v. Cement Div., Nat. Gypsum Co., 515 U.S. 189, 195 (1995) ("The essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss."); Kansas v. Colorado, 533 U.S. 1, 10 (2001) (recognizing that "a monetary award does not fully compensate for an injury unless it includes an interest component"); United States v. Bell, 602 F.3d 1074, 1084 (9th Cir. 2010), amended, 734 F.3d 1223 (9th Cir. 2013); Oyos, supra at 484 (stating that one of purposes of prejudgment interest is "to make whole an injured party for losses suffered). Just as a very low prejudgment interest rate may create a perverse incentive for a defaulting party to not pay debts and stall in litigation, a prejudgment interest rate that is too high might prompt a party entitled to money to sue prematurely and to delay taking judgment, if attorney's fees and litigation costs can be controlled and that party does not need the monies immediately. What constitutes a reasonable rate of return is, of course, difficult to calculate. The rate should be at least the rate of inflation—here approximately 1.8% on average per annum over the time in question. The one-year federal treasury yield rate—.56% per annum in April of 2016—reflects a return on perhaps the most secure investment and below what most investors would expect on monies.

Ultimately, this Court is left with certain guideposts for the annual prejudgment interest rate—15%, 10%, 5.48%, 1.8%, .56%—and must use its discretion to select a proper prejudgment interest rate. Again, the Tribe's law governs, the Tribe's postjudgment interest rate is a high one

at 15% per annum, and there is no tribal prejudgment interest rate. Under these circumstances, one-half of the Tribe's postjudgment interest rate—effectively 7.5% per annum—gives some deference to the Tribe's choice of a lofty interest rate postjudgment, and yet is not too far afield from what would appear to be a proper prejudgment interest rate to avoid rewarding (or improperly penalizing) a party not paying contractual obligations and to avoid unduly enriching (while properly compensating) a party from whom contractually owed monies are withheld.

## D. Calculation of Amounts Owed

The calculation of the amount Cottonwood Knoll owes the Tribe becomes a bit complicated because of the adjustments for property taxes paid on February 13, 2013, and for the 2014 property tax payments. Further, this Court remains uncertain what the adjustment should be for property taxes in 2015 or 2016, because Cottonwood Knoll has not yet paid property taxes for those years and may have incurred interest and penalties for which it would not be entitled to an adjustment. The following tables show how this Court calculates amounts owed:

**Calculation through February 13, 2013, and then through April 1, 2013**

| Due Date | Amount | Interest to 02/13/2013 |
|---|---|---|
| 10/01/11 | $67,500.00 | 500 days x 7.5%/year = $6,934.93 |
| 04/01/12 | $67,500.00 | 318 days x 7.5%/year = $4,410.62 |
| 10/01/12 | $67,500.00 | 135 days x 7.5%/year = $1,872.43 |
| Total: | $202,500.00 | $13,222.98 |
| Total Owed by Cottonwood Knoll to the Tribe on 02/13/13 = $215,722.98 ($202,500.00 + $13,222.98) | | |
| Adjustment for property tax payment on 02/13/13: $267,000.00 | | |
| Credit Balance of Cottonwood Knoll on 02/13/13: $51,277.02 to be adjusted from next payment ($267,000.00 - $215,722.98) | | |

23

| Calculation of April 2013 Adjustment | |
|---|---|
| 04/01/13 | Interest on $51,277.02 for 46 days x 7.5% = $484.67 |
| Cottonwood Knoll Credit Balance as of 03/31/13 = $51,761.69 ($51,277.02 + $484.67) | |
| Cottonwood Knoll debt as of 04/01/13 = $15,738.31 ($67,500.00 - $51,761.69) | |

## Calculation through July 1, 2016

| Due Date | Amount | Interest to 07/01/16 |
|---|---|---|
| 04/01/13 | $15,738.31 | 3 years + 91 days (3.25) x 7.5%/year = $3,836.21 |
| 10/10/13 | $67,500.00 | 2 years + 273 days (2.75) x 7.5%/year = $13,921.88 |
| 04/01/14[6] | $54,163.33 ($67,500.00-$13,336.67) | 2 years + 91 days (2.25) x 7.5%/year = $9,140.06 |
| 10/01/14[7] | $54,163.33 ($67,500.00-$13,336.67) | 1 year + 273 days (1.75) x 7.5%/year = $7,108.94 |
| 04/01/15 | $67,500.00 | 1 year + 91 days (1.25) x 7.5%/year = $6,328.13 |
| 10/01/15 | $67,500.00 | 273 days (.75) x 7.5%/year = $3,796.88 |
| 04/01/16 | $67,500.00 | 91 days (.25) x 7.5%/year = $1,265.62 |
| Total: | $394,064.97 | $45,397.72 |
| Total owed to Tribe as of July 1, 2016 (unless further taxes paid) = $439,462.69 | | |

Cottonwood Knoll is entitled to adjust downward the amounts owed for April 1 and October 1, 2015, and in 2016, for Mellette County property taxes actually paid, although no adjustment for any penalty or interest paid to Mellette County may be claimed. However, if

---

[6] Cottonwood Knoll paid the 2014 property taxes, albeit late with a penalty. This Court prorated the property tax payments (net of and not including interest and penalty) and reduced the actual amount of taxes from the rent payment. Cottonwood Knoll is entitled to a credit for payment of the 2015 and 2016 taxes similarly. However, Cottonwood Knoll is entitled to no adjustment for interest or penalty paid to Mellette County.

[7] The same methodology explained in the footnote above applies to this calculation.

24

Cottonwood Knoll will no longer be paying property taxes, it owes the Tribe $439,462.69, as of

July 1, 2016.

## III.   Conclusion and Order

For the reasons explained above, it is hereby

ORDERED that Cottonwood Knoll's Motion for Court to Determine Offset, Doc. 207, is

granted in part as set forth above.


DATED this __1ˢᵗ__ day of July, 2016.

BY THE COURT:


ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE