UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| SUN PRAIRIE, A PARTNERSHIP; AND BELL FARMS LLP, A NEBRASKA LIMITED LIABILITY PARTNERSHIP, | 3:02-CV-03030-RAL |
| Plaintiffs, | |
| and | |
| COTTONWOOD KNOLL, LLC., | OPINION AND ORDER ON MOTION FOR APPROVAL OF CLOSURE PLANS |
| Intervenor Plaintiff, | |
| vs. | |
| TARA KATUK MAC LEAN SWEENY,[1] ASSISTANT SECRETARY-INDIAN AFFAIRS, U.S. DEPARTMENT OF THE INTERIOR, IN HER OFFICIAL CAPACITY; DAVID BERNHARDT, SECRETARY OF THE DEPARTMENT OF THE INTERIOR, IN HIS OFFICIAL CAPACITY; ROSEBUD SIOUX TRIBE, A FEDERALLY RECOGNIZED TRIBE, | |
| Defendants. | |

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Tara Katuk Mac Lean Sweeney and David L. Bernhardt are substituted as defendants in this suit.  Tara Katuk Mac Lean Sweeney, the current Assistant Secretary- Indian Affairs, was confirmed by the United States Senate on June 28, 2018, and assumed her official duties on July 30, 2018.  David L. Bernhardt, the current Secretary of the Department of the Interior was confirmed by the United States Senate on April 11, 2019, and took office on the same day.

1

On August 3, 2020, this Court held a motion hearing on two pending motions in this case: 1) Rosebud Sioux Tribe's Motion for Approval of Settlement Agreement or Judgment by Consent, Doc. 238; and 2) Cottonwood Knoll's Motion for Approval of Closure Plans, Doc. 240. The Rosebud Sioux Tribe's Motion was made days after the Land Lease for certain hog confinement facilities expired and contemplated a possible settlement agreement among the parties which never transpired. This Court at the August 3 hearing denied the motion for approval of settlement agreement as moot in light of the absence of any settlement agreement. This Opinion and Order addresses the remaining Motion for Approval of Closure Plans. Some background facts aid in understanding the current issues and in ruling on the pending motion.

## I.    Background Facts

Now-defunct Plaintiff Sun Prairie, a general partnership (Sun Prairie) and officials of the Rosebud Sioux Tribe (the Tribe) discussed business opportunities to promote economic development on the Rosebud Sioux Indian Reservation in early 1998. Sun Prairie and the Tribe signed a letter of intent in April of 1998 and negotiated a lease contemplating that Sun Prairie would secure financing to build multi-site hog confinement facilities on trust land in Mellette County, that Bell Farms, LLP (Bell Farms) would operate and manage the sites, and that the Tribe would provide water and other support. Sun Prairie secured financing for the project from U.S. Bancorp Ag Credit, Inc. (U.S. Bancorp). In September of 1998, the Tribe and Sun Prairie entered into the Land Lease, Docs. 177-4 and 252-1, which in turn was approved by the Bureau of Indian Affairs. Sun Prairie then began construction of hog confinement facilities at the "Grassy Knoll" site and later at the "Cottonwood Farm" site within the Rosebud Sioux Indian Reservation.

The project met almost immediate public opposition, resulting in three separate lawsuits in two United States district courts—Concerned Rosebud Area Citizens v. Babbitt, No. 98-2841

(D.D.C. filed November 23, 1998, and dismissed July 12, 1999); <u>Rosebud Sioux Tribe v. Gover</u>, No. 99-3003-CBK (D.S.D. filed February 3, 1999, and dismissed May 30, 2003); and this action, <u>Sun Prairie v. Rosebud Sioux Tribe</u>, No. 02-3030-RAL (D.S.D. filed August 15, 2002). Sun Prairie and Bell Farms filed this action after the Tribe, which had elected a new tribal president, became unsupportive of Sun Prairie's business ventures on the reservation. In April of 2005, the parties in this case settled many of their disputes by negotiating and agreeing to the terms of a Judgment by Consent and Order (Judgment by Consent), which was signed by the Honorable Richard H. Battey on May 19, 2005. Doc. 164. That Judgment by Consent modified but did not nullify the Land Lease. Doc. 164 at ¶ 5.a.(vii).

Sun Prairie, through its operator Bell Farms, ran hog confinement operations at the two sites—Grassy Knoll and Cottonwood Farm—until 2012. Each site contained 24 large hog confinement buildings and hog waste lagoons, among other things. Bell Farms reportedly ceased operations in or around May of 2012, and there apparently have been no hogs at either site since.

Since the cessation of hog confinement operations at the sites, the parties have presented several disputes to this Court that lead up to the present issues. In June of 2012, the Tribe filed a Motion for an Order to Show Cause, seeking to enforce certain provisions of the Judgment by Consent. Cottonwood Knoll, LLC (Cottonwood Knoll) intervened in July of 2012, as a party asserting an interest in the property. Cottonwood Knoll had become the successor to the original mortgagor U.S. Bancorp at that point and was foreclosing on Sun Prairie. This Court conducted a hearing on July 30, 2012, in which the Tribe, intervenor Cottonwood Knoll, and the United States Government participated. This Court entered an Order for Enforcement of Judgment by Consent

on July 31, 2012, applying Paragraph 11[2] of the Judgment by Consent to bind successors and assigns of the Plaintiffs Sun Prairie and Bell Farms to that Judgment, ordering Plaintiffs and any successors and assigns to comply with the provisions of Paragraph 7[3] of the Judgment by Consent, and allowing any party to file a motion to enlarge the deadline for compliance with Paragraph 7 or otherwise seek relief from this Court. Doc. 187. Through an Amended Order for Enforcement of Judgment by Consent, this Court enlarged Cottonwood Knoll's deadline for compliance with Paragraph 7 of the Judgment by Consent or to otherwise seek relief to December 31, 2013. Doc. 189.

Cottonwood Knoll, after Sun Prairie and Bell Farms had ceased operations at Grassy Knoll and Cottonwood Farms, had initiated a foreclosure action in state court in Mellette County and had obtained a default judgment in the amount of $15,370,337.73, and a decree of foreclosure against Sun Prairie in August of 2012. Doc. 194-1. The Mellette County Circuit Court determined the fair and reasonable value of foreclosed property—the leasehold interest, structures, and equipment at Grassy Knoll and Cottonwood Farms—at that time to be $2,275,000.00. Doc. 194-2. Cottonwood Knoll was the winning bidder at a foreclosure sale in December of 2013, with a certificate of sale recorded in late December of 2013. Doc. 194-3. The one-year statutory redemption period on Sun Prairie's interest under South Dakota Codified Laws (SDCL) § 21-52-11 expired in December of 2014. As a result, Cottonwood Knoll assumed the leasehold interest for the two hog confinement sites.

---

[2]Paragraph 11 of the Judgment by Consent provided: "This Consent Judgment is final and binding on the Parties and their successors and assigns." Doc. 164 at 13.
[3]Paragraph 7 of the Judgment by Consent contained provisions for environmental controls and measures. Doc. 164 at 9–10.

4

In November of 2014, Cottonwood Knoll filed a Motion for Relief from Consent Judgment, Doc. 192, seeking to be relieved from the requirements of Paragraphs 4 and 7 of the Judgment by Consent in light of the "complete cessation of farming operations," by Sun Prairie and Bell Farms. Doc. 193 at 12. Cottonwood Knoll argued that the Land Lease has expired, that there were no environmental issues with the sites, and that Cottonwood Knoll should be relieved of responsibility under the Judgment by Consent.[4] Doc. 193. The Tribe opposed Cottonwood Knoll's Motion for Relief from Consent Judgment and filed its own Motion to Compel Specific Performance. Docs. 196, 197. The Tribe argued that Plaintiffs and Cottonwood Knoll had abandoned the premises, thereby triggering a reclamation obligation under Exhibit I to the Land Lease to remove all improvements from the two dormant hog confinement sites and to remediate and return the sites to their original conditions. Doc. 197. Alternatively, the Tribe argued that the Judgment by Consent ran the land lease to May 19, 2020.[5] Doc. 197. Cottonwood Knoll opposed the Tribe's Motion for Specific Performance and filed a Motion to Stay Pending Motions and to Require Mediation.[6] Docs. 199, 200, 202. Cottonwood Knoll countered that the sites had not been abandoned, that it had a maintenance employee on site, and that it had sought—albeit unsuccessfully—to find a new operator. According to Cottonwood Knoll, the improvements on

---

[4] Cottonwood Knoll also raised an issue involving property tax payments owed to Mellette County and an entitlement to an adjustment of what it owed the Tribe under the Land Lease as a result.

[5] The Tribe also claimed it was owed past-due rent of $405,000.00, plus interest, as well as water charges. The Tribe resisted any offset for property taxes paid by Sun Prairie or Cottonwood Knoll to Mellette County. Doc. 197. This court in a separate Opinion and Order in July of 2016 ruled on the issue of the amount Cottonwood Knoll owed the Tribe after the parties were unable to agree on that issue. Doc. 234.

[6] Cottonwood Knoll invoked Paragraph 12.b. of the Judgment by Consent, under which the parties were to "negotiate in good faith to resolve any dispute relating to the interpretation and implementation of this Judgment by Consent before bringing the matter to the Court's attention." Doc. 164 ¶ 12.b.

the sites were worth over $2 million, and Cottonwood Knoll has offered them back to the Tribe free of charge to end the relationship altogether, but the Tribe has spurned that opportunity.

This Court's rulings on those 2014 and 2015 motions lead to the current dispute between the parties, and part of this Court's past ruling addressed one issue being relitigated by the parties now.  In an Opinion and Order issued in April of 2015, this Court resolved the dispute over the lease term and whether the lease has terminated or alternatively the sites had been abandoned. Doc. 206.  Relying on Paragraph 4 of the Judgment by Consent, this Court determined that the term of operation by Sun Prairie and Bell Farms, or their respective successors was no more than 15 years from the date Consent Judgment and Order became effective, which was on May 19, 2005.  Doc. 206 at 10; *see* Doc. 164 at ¶ 4.a.  Under paragraphs 4.b. and 4.c. of the Judgment by Consent, at the expiration of the fifteen-year term, the Tribe would have the right to purchase the buildings and improvements at the sites by paying half of the fair market value; if the Tribe did not exercise its right to purchase, Sun Prairie or its successors could exercise "a one-time extension of the Lease term for an additional five (5) years." Doc. 164 ¶ 4.  After analyzing the language of the Judgment by Consent and Land Lease, this Court rejected Cottonwood Knoll's argument that the lease term had expired.  Doc. 206 at 10-12.

This Court then considered and rejected the Tribe's assertion that there has been "abandonment of the Premises by Lessee" thereby triggering the reclamation plan under Exhibit I to the Land Lease.  This Court reasoned:

> The cessation of hog confinement activities at Grassy Knoll and Cottonwood Farms and the desire of Cottonwood Knoll to give the facilities to the Tribe to be relieved of its responsibility is not necessarily "abandonment of the Premises." Abandonment is the "absolute relinquishment of [a] premises by a tenant, and consists of acts or omissions and an intent to abandon." Smith v. Hegg, 214 N.W.2d 789, 792 (S.D. 1974) (quotation and emphasis omitted); see also Bank of Del. v. Claymont Fire Co. No. 1, 528 A.2d 1196, 1198 (Del. 1987); Restatement (Second) of Property § 12.1 cmt. i (1977) ("An abandonment of the leased property by the

6

tenant occurs when he vacates the leased property without justification and without any present intention of returning and he defaults in the payment of the rent."). Generally, the "mere absence of physical occupancy" does not constitute abandonment because, even though a lease provision may limit how a tenant may use a premises, such a provision is not a requirement that the tenant use the premises at all. Smith, 214 N.W.2d at 792; see also Bank of Del., 528 A.2d at 1198–99 (finding lessee fire company was not required to provide continuous service under the lease); Baron Bros., Inc. v. Nat'l Bank of S.D., Sioux Falls, 155 N.W.2d 300, 302–03 (S.D. 1968) (holding a provision in a lease that stated "[l]essee will use the demised premises for the purposes of its banking and trust business" did not require the bank to actually carry on such business activity for the duration of the lease). In this case, Section 15 of the Land Lease restricted Sun Prairie's use of the premises to constructing and operating the planned hog confinement operation, Doc. 177-4 § 15, but that restriction did not require the continuous operation of the hog confinement facilities for the duration of the lease. Moreover, Section 15 of the Land Lease allows a party who takes possession of the leasehold interest following foreclosure to use the premises "for any lawful purpose" other than gaming. Id. Neither Sun Prairie nor Cottonwood Knoll is obligated to continue the hog confinement operation for the duration of the lease, and the absence of the hog operation alone does not constitute abandonment. Cottonwood Knoll has an employee on its payroll monitoring the sites and has sought to find another operator for the sites. The Tribe in its filings acknowledged that at least one site was mowed and maintained. Doc. 197-3 at 12. Cottonwood Knoll would continue hog confinement activities at the sites if it could find an operator that could viably run such hog confinement and feedlot operations. There has been no physical act of abandonment nor does it appear that Cottonwood Knoll has the intent at this time to abandon the premises. Thus, the lease has not been terminated by reason of abandonment, and the reclamation responsibilities of Exhibit I are not triggered at this time. Rather, under the language of the Judgment by Consent and the underlying Land Lease, the lease remains in effect at this time and through May 19, 2020.

Doc. 206 at 13–15.

The lone motion pending before this Court is Cottonwood Knoll's Motion for Approval of Closure Plans. Doc. 240. Cottonwood Knoll represents that it has worked for two years to develop closure plans for the sites; has hired Enviro-Ag Engineering, Inc., to develop closure plans; has supplied the plans to the Tribe and United States governmental agencies; has revised the original plans to accommodate concerns expressed by the Environmental Protection Agency (EPA) and Bureau of Indian Affairs (BIA); and had not received objection from the Tribe or BIA to the

revised closure plans. Doc. 241. The proposed Closure Plans are part of the CM/ECF record, which this Court has reviewed. Docs. 241-2, 241-3. Cottonwood Knoll acknowledged that Paragraph 7 of the Judgment by Consent required "a bond or other financial security" and stated that it planned "to obtain the bond or financial security upon approval of the Revised Closure Plans" because it was uncertain what the scope of work or costs would be before that time. Doc. 241 at ¶ 13.

The BIA objected to the Closure Plans for four reasons: 1) "they do not contain planned steps or provisions proposing to repair or remove dilapidated buildings and/or facilities at the sites;" 2) they lack a third-party monitor; 3) there is no "bond in an amount large enough to cover remediation" under Paragraph 7.a.(iii) of the Judgment by Consent; and 4) the plans have no statement "that the United States is not assuming any liability under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA) or other applicable state or federal law, nor is the United States assuming shared responsibility for liability by concurring with, or approving, a closure plan." Doc. 244 at 2-3. The BIA filed a Declaration of a BIA Regional Environmental Engineer who deemed the revised closure plans adequate with respect to removal and remediation of the hog biosolids and associated organic matter, but not with respect to the "physical environment" because of an absence of any proposal to repair or remove facilities in disrepair at both sites. Doc. 245 at 4.

The Tribe filed a more extensive objection to the Closure Plans with supporting affidavits and materials. Docs. 247, 248, 249, 250, 251, 252. Included in the Tribe's material are drone video and aerial photographs of the two sites showing that roughly half of the 48[7] large hog

---

[7] At one site, one building appears to have been removed (or perhaps never built) such that there are a total of 47 hog confinement buildings with about half appearing intact, some appearing to have modest roof damage, and others appearing to have extensive damage.

confinement buildings have at least some roof damage and that more than a quarter of the buildings have extensive structural damage with debris from such buildings onsite.  Doc. 250.  This Court cannot tell from what is in the CM/ECF record the extent of the disrepair of the hog confinement structures at the two sites.  The Tribe makes clear its reverence for the earth, wind and water, to explain its position that this Court should order compliance with Exhibit I to the Land Lease—the BIA Reclamation Plan triggered "[i]n the event that the Lease is terminated by reason of abandonment of the Premises by Lessee."  That Reclamation Plan, among other things, requires removal of all structures from the sites, lifting and removing of all poured concrete, and backfilling, reshaping, and reseeding of the terrain.  Docs. 177-4, 252-1.  The Tribe also requests that this Court have a "fairness hearing" to hear from tribal elders, employ equitable principles to require Cottonwood Knoll to restore the sites to their pre-1998 conditions, preclude any waste disposal within reservation boundaries, ensure payment to the Tribe of any outstanding rent and water bills, and require a court-approved bond.  Doc. 247.

## II.    Discussion

### A.  Applicable Law

The agreement between these parties consists of the Land Lease, in which Cottonwood Knoll was the successor to the Permitted Mortgagee[8] and is now the successor to Sun Prairie by foreclosure, as modified and superseded by the Judgment by Consent to which Cottonwood Knoll is bound both as a successor of Sun Prairie and by order of this Court.  Docs. 164, 177-4, 187, 252-1.  Section 38 of the Land Lease specifies:  "This Lease shall be construed for all purposes in accordance with and governed by the laws of the Tribe . . . ."  Doc. 177-4 § 38.  No parties to this

---

[8] Sections 18 and 19 of the Land Lease contain provisions regarding the Permitted Mortgagee, which originally was U.S. Bancorp and now is Cottonwood Knoll.  Doc. 177-4 §§ 18–19.

9

case have pointed to any unique aspect of the law of the Rosebud Sioux Tribe concerning contract interpretation, and there appears to be nothing peculiar about the laws of the Rosebud Sioux Tribe concerning interpreting a contract. <u>See</u> Rosebud Sioux Commercial Code § 14-1-103 (supplementing the Tribe's commercial code with "the principles of law and equity").

The Judgment by Consent modifies and supersedes, but does not displace, the Land Lease. Doc. 164 ¶ 5.a.(vii). Such consent decrees have attributes of an ordinary contract, and thus, the same canons of contract construction generally apply. <u>United States v. ITT Cont'l Baking Co.</u>, 420 U.S. 223, 236–38 (1975); <u>Musso v. Univ. of Minn.</u>, 105 F.3d 409, 411 (8th Cir. 1997); <u>Mahers v. Hedgepeth</u>, 32 F.3d 1273, 1274–75 (8th Cir. 1994). However, because a consent decree represents a compromise between hostile litigants, the approach to interpreting a consent decree differs somewhat from the approach to interpreting a contract. <u>Mahers</u>, 32 F.3d at 1275. Recognizing that a consent decree is entered into by litigating parties and thus embodies a compromise between adversarial parties, the Supreme Court of the United States in <u>United States v. Armour & Co.</u>, 402 U.S. 673 (1971) reasoned:

> Thus the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.

<u>Id.</u> at 681–82 (emphasis added) (footnote omitted). Accordingly, this Court must confine its consideration of the Judgment by Consent to the "four corners" of that document and not seek to discern a single purpose of the parties.

The general rules for interpreting contracts include that contracts are to be enforced according to their terms, with the intent of the parties derived from reading the contract as a whole.

E.g., Smith v. Arrington Oil & Gas, Inc., 664 F.3d 1208, 1212 (8th Cir. 2012) (applying Arkansas contract law); Myers v. Richland Cnty., 429 F.3d 740, 751 (8th Cir. 2005) (applying North Dakota contract law); Restatement (Second) of Contracts § 202(2) & cmt. d (Am. Law Inst. 1981).   The language of the contract is to be given its ordinary and plain meaning.   Chavis Van & Storage of Myrtle Beach, Inc. v. United Van Lines, LLC, 784 F.3d 1183, 1188 (8th Cir. 2015) (applying Missouri contract law); Southland Metals, Inc. v. American Castings, LLC, 800 F.3d 452, 459 (8th Cir. 2015) (applying Oklahoma contract law); Restatement (Second) of Contracts § 202(3)(a) (Am. Law Inst. 1981).   The terms of the contract are to be enforced when there is no ambiguity, and the mere fact that there is a dispute over application of a term does not render that term ambiguous. Chavis Van & Storage of Myrtle Beach, Inc., 784 F.3d at 1188. A contract is ambiguous when, by giving effect to the entirety of the contract and interpreting terms according to their common meanings, the provisions are reasonably capable of conflicting interpretations.   Southland Metals, Inc., 800 F.3d at 459; see generally Sioux Falls Pizza Co. v. Little Caesar Enters., Inc., 858 F. Supp. 2d 1053, 1060–61 (D.S.D. 2012) (discussing general principles of contract interpretation under Michigan law); Restatement (Second) of Contract §§ 200–03 (Am. Law Inst. 1981).

**B.  Analysis of Objections to Closure Plans**

Some of the BIA and Tribe's objections to the revised closure plans are easy to address. Paragraph 7.a.(iii) of the Judgment by Consent requires of Cottonwood Knoll "a bond or other appropriate financial security" as a part of "a waste management closure plan."  Cottonwood Knoll recognizes this responsibility, but did not know if there would be approval of closure plans or additional work, so held off on that requirement.   Nothing in the Land Lease or Judgment by Consent requires that "the bond or other appropriate financial security" be court-approved as the

Tribe requests, though this Court does retain jurisdiction under the Judgment by Consent if there is some additional issue with this.

No provision of the Land Lease or Judgment by Consent requires the Court to appoint a third-party monitor at the expense of Cottonwood Knoll (or its predecessors in interest) as the BIA requests. Likewise, there is no provision mandating Cottonwood Knoll to affirm that the United States is not assuming CERCLA liability under any closure plan, nor is any party claiming in this suit that the BIA or United States is doing so. Nor are there any provisions in the Judgment by Consent to preclude waste disposal within reservation boundaries,[9] to require a "fairness hearing" to hear from tribal elders,[10] or to supplant provisions of the Land Lease and Judgment by Consent with equitable principles to require more from Cottonwood Knoll than its predecessors in interest bargained for, as the Tribe urges.

The remaining objections to the revised closure plans do not quibble with the plans as far as they go, but assert that the closure plans do not go far enough. Indeed, Cottonwood Knoll revised the closure plans to accommodate certain concerns of the EPA and BIA, and a BIA regional environmental engineer deemed the revised Closure Plans adequate with respect to removal and remediation of hog biosolids and associated organic matter, Doc. 245 at 4, though not with respect to the "physical environment." The principal issues that remain are whether, as the Tribe urges, this Court should require compliance with the Reclamation Plan that was Exhibit I to the Land Lease due to claimed termination of the Land Lease by "abandonment of the Premises" and what

---

[9] This does not mean that Cottonwood Knoll can dispose of waste in any way it sees fit, but Cottonwood Knoll is not debarred from making arrangements to dispose of waste at authorized landfills on the reservation for instance.

[10] This Court is aware that many tribal elders would consider such hog confinement operations and facilities to be anathema to the Sicangu Oyate Lakota's traditional values.

this Court should do about the fact that the sites have dilapidated and damaged hog confinement buildings and debris onsite.

This Court's past rulings address these issues in part. As quoted above, this Court has interpreted the Judgment by Consent under Paragraph 4.c. to provide that at the end of a fifteen-year period—which term closed on May 19, 2020—the Tribe would have the right to purchase the buildings and improvements at the sites at half of the fair market value. Doc. 164 at ¶ 4.b. Doc. 206 at 10. Quite obviously, the Tribe has neither exercised that right nor wants the buildings or improvements to exist at all. The Judgment by Consent allowed, but did not require, Sun Prairie and in turn its successor Cottonwood Knoll a one-time extension of the lease for another five years. Doc. 164 at ¶ 4.c. Quite obviously, Cottonwood Knoll is not interested in any extension of any length for long-vacant hog confinement facilities for which it had been continuing to pay rent through May 19, 2020. The parties in negotiating the Judgment by Consent did not specifically address the situation where neither the Tribe nor the facility operator wanted hog confinement operations to continue at the site. When negotiating that Judgment back in 2005, both sides contemplated, incorrectly as it turns out, that one party or the other would want to continue the operations after May 2020.

The Tribe urges this Court to impose the Reclamation Plan that is Exhibit I to the Land Lease. That Reclamation Plan by its terms applies "[i]n the event that the Lease is terminated by reason of abandonment of the Premises by Lessee." Doc. 177-4 at 50–51. As quoted at length above, this Court in April of 2015 concluded that Cottonwood Knoll and its predecessor had not abandoned the premises. Doc. 296 at 13–15. After this Court's Opinion and Order in April of 2015, Cottonwood Knoll continued to pay rent, though it neither kept hogs at the sites nor kept all of the confinement buildings in good repair. The reasoning of this Court need not be repeated

13

anew; in short, this lease did not terminate "by reason of abandonment of the [p]remises," but rather by expiration of the fifteen-year term in the Judgment by Consent. Thus, the Reclamation Plan in Exhibit I does not apply.

This Court then is left with the Judgment by Consent and terms of the Land Lease not superseded by the Judgment by Consent. Paragraph 7.a.(iii) of the Judgment by Consent specifies a waste management system closure plan, and what Cottonwood Knoll asks to be approved are such closure plans, albeit without the required bond or adequate financial security. The main problem with the revised closure plans is the absence of any plan to deal with the debris and dilapidated buildings onsite.

The Land Lease contemplated that there would be no such debris or dilapidated buildings at the end of the lease term. Section 26 of the Land Lease provides, in relevant part:

> The Lessee will, at its expense, maintain, repair and replace, whether as a result of casualty, or otherwise, the Premises and all Improvements now located or hereafter constructed thereon ... pursuant to the terms of this Lease in order that the same is in good, safe and habitable condition throughout the term of this Lease, ordinary wear and tear excepted.

Doc. 177-4 at ¶ 26. Cottonwood Knoll and its predecessors failed to do so with regard to many of the hog confinement building as is evident from the drone video and aerial photographs. See Doc. 250. The damage to those buildings is not "ordinary wear and tear." Section 26 made sense at the time of the Land Lease and Judgment by Consent when the Tribe was to be given an option to purchase the improvements on the sites at half the fair market value when the lease term expired in May of 2020, and when absent exercise of that option, the operator could continue operations for five more years. Specific enforcement of this term by requiring Cottonwood Knoll to repair and replace the dilapidated improvements benefits neither the Tribe who wants all improvements removed, nor Cottonwood Knoll who wants out of this situation without losing more money. This

14

dilemma ought to be one the parties resolve under Paragraph 12.b. of the Judgment by Consent which requires them "to negotiate in good faith to resolve any dispute relating to the interpretation and implementation of this Consent Judgment before bringing the matter to the Court's attention." Doc. 164 at ¶ 12.b.

Returning to the pending motion, there is no reason why this Court should withhold approval of the revised Closure Plans to the extent they address removal and remediation of biological waste, so long as a bond or adequate financial security is furnished. The Tribe of course must cooperate by allowing access to the property to those carrying out the Closure Plans. The motion before this Court only seeks approval of the revised Closure Plans and does not seek to excuse Cottonwood Knoll from its responsibility for the debris and dilapidated buildings onsite. This Court expects that this Opinion and Order frames the lone remaining issue for the parties to negotiate successfully. This Court is not in a position, based on drone video and aerial photos and given the absence of language in the Judgment by Consent or Land Lease addressing this situation, to sort out for the parties at this time what they ought to resolve in good faith through negotiation. Therefore, it is hereby

ORDERED that Cottonwood Knoll's motion to approve Closure Plans, Doc. 250, is granted to the extent that the revised Closure Plans filed as Docs. 241-2 and 241-3 are approved under Paragraph 7.a.(iii) of the Judgment by Consent, so long as Cottonwood Knoll posts a bond or other appropriate financial security. It is further

ORDERED that the Tribe allow Cottonwood Knoll and those it hires to carry out the closure plans access to the Grassy Knoll and Cottonwood Farms sites. It is further

ORDERED that Cottonwood Knoll pay the usual and fair price for any water or utilities it uses from the Tribe and that the Tribe shall not disrupt water or utility service to the sites as long

as Cottonwood Knoll is not in arrears on payment.  That is, the parties are to cooperate with one another in implementing the revised closure plans.  It is finally

ORDERED that the parties must negotiate under Paragraph 12.b. of the Judgment by Consent in good faith over possible removal of structures not properly maintained on the sites with more damage than ordinary wear and tear, as well as removal of debris from the sites.  Magistrate judges in the District of South Dakota are available to conduct mediations of matters such as the lone remaining issue in this case.

DATED this 19ᵗʰ day of August, 2020.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE

16